[This opinion has been published in *Ohio Official Reports* at 78 Ohio St.3d 2.]

THE STATE EX REL. MIDMARK CORPORATION, APPELLEE AND CROSS-APPELLANT, *v*. INDUSTRIAL COMMISSION OF OHIO; SERGENT, APPELLANT AND CROSS-APPELLEE.

[Cite as *State ex rel. Midmark Corp. v. Indus. Comm.*, 1997-Ohio-247.]

*Workers' compensation—Application for permanent total disability compensation—Surveillance videotape evidence submitted by employer at hearing—Industrial Commission did not abuse its discretion in not requiring commission specialist to view the videotape and in relying on the commission specialist's report in awarding compensation.*

(No. 95-20—Submitted January 7, 1997—Decided March 12, 1997.)

APPEAL AND CROSS-APPEAL from the Court of Appeals for Franklin County, No. 93APD10-1457.

————————

{¶ 1} Claimant-appellant and cross-appellee, Billy Sergent, was injured in 1973 and 1984 while employed at Peerless Machinery Corporation and Midmark Corporation, appellee and cross-appellant, respectively. His workers' compensation claims were allowed for "probable continuous nerve injury, medial aspect of right thigh, twisted back"; and "traumatic injury to low back and coccyx; herniated disc at L5-S1 level and aggravation of pre-existing spondylolisthesis of L2-L3." Except for a short period in 1986, claimant did not work after his last injury in 1984. In 1988, examining physician Dr. Steven S. Wunder reported:

"He claimed an inability to ambulate. When he went from sit to stand, he used his canes. He stated that I had to hold him to walk and when I told him that I did not think this was necessary, he promptly acted as if he was going to fall and sat back down in the chair ever so carefully. Once we got him away from the chair, he was able [to] walk with his canes without my assistance. His gait was bizarre

and inconsistent with most antalgic gait patterns. Heel and toe walking really could not be assessed because of excessive movements. He insisted on keeping his brace on throughout the exam. In fact, he told me that he has had this brace for one year but it had a perfectly new appearance and certainly was not well worn. When I commented on this, he indicated that he stayed in bed most of the day.

"The patient claimed to have pain from the upper dorsal to sacral regions bilaterally. The areas of tenderness were not always reproducible. With his attention diverted, pain did not always seem to be present. However, with formal testing he complained of excruciating pain to even gentle palpation.

"* * *

"Mr. Sergent's history and physical examination reveals [*sic.*] evidence of L2-3 spondylolisthesis, osteoarthritis, mechanical back pain and conversion features. The patient was felt to have an unstable spine as early as 1977. His condition was temporarily rendered symptomatic by the 1984 injury but was not substantially aggravated by this. By this I mean that there was [*sic.*] no neurologic deficit in relation to motor, sensory and reflex exam and no bowel or bladder change. He has well documented long standing back problems dating from 1973 and indeed reported to Dr. Tillotson in 1977 that he had back pain 24 hours per day. Not only does his examination not demonstrate neurologic impairment, his EMG also has been normal. He does have a psychiatric history dating back to at least 1976 with Dr. Kostoff noting conversion symptoms at that time. He has demonstrated conversion and dependency needs even requesting an electric wheelchair despite normal neurologic exam. His condition probably is permanent."

{¶ 2} A June 8, 1989 exam by Dr. John W. Cunningham documented similar inconsistency between claimant's presentation when he knew he was being observed and when he did not. Dr. Cunningham ultimately assessed a fifty-percent permanent partial impairment.

**{¶ 3}** Suspicious of claimant's abilities, Midmark Corporation hired a private investigation firm to monitor claimant's activities. The investigators watched claimant's home on four days in August 1989. On August 14, 1989, no activity was recorded. On the next two days, the investigators reported:

"During the course of our surveillance, we observed subject involved in several activities, moving about at will. He was observed driving, climbing stairs, and doing considerable walking, with the use of a single cane.

"For the majority of the two days of surveillance, subject's primary activity was working on the window frames at the side of his residence. During this activity, subject was observed walking short distances without the use of the cane, climbing onto a step ladder and pulling himself up on a scaffold and then climbing down. He was also observed using hand tools, such as a scraper, drill, and hammer, without apparent difficulty."

**{¶ 4}** On August 29, 1989, the surveillance team made the following entries:

"11:35 a.m. We observe the subject exiting the Ohio Building, walking at a slow pace, using a cane in his right hand. * * * Subject's wife is assisting him as he walks to the vehicle. She helps him into the passenger side of the car, and they leave the area.

"11:44 a.m. They arrive at subject's residence. Subject exits the passenger side of the vehicle without assistance and walks to the residence with the cane in his right hand. NOTE: It does not appear that subject is using the cane for support, and he appears to walk at a faster pace. * * *

"11:54 a.m. Subject and wife exit the residence. * * * Subject enters the passenger side of the blue Oldsmobile, while his wife gets into the driver's side. They then leave the area * * *.

"* * *

"12:41 p.m. Subject's vehicle takes a Troy exit * * * to the office of Dr. Nims M.D., Inc. * * * We note Dr. Nims is a psychiatrist.

"12:43 p.m. Subject's wife assists him in exiting the vehicle. We note that at this time, subject is using two canes. Subject and wife walk to the front door of the office, subject's wife still assisting him. They stand there for a moment, then she helps him back to the car. Subject has one arm around his wife's shoulders and a cane in his right hand. She helps him back into the car, and they remain seated in the vehicle in the parking lot.

"* * *

"1:46 p.m. We observe subject leave the Doctor's office and enter his vehicle, his wife helping him. He uses two canes. Subject leans against the car while his wife opens the door to the passenger side. He then backs into the seat and she assists him. She closes the door and walks around and enters the driver's side of the vehicle. * * *

"* * *

"2:17 p.m. The vehicle stops at * * *. Subject and wife exit the vehicle. We note that subject's wife does not assist him this time, and he is using only one cane. He is walking with less difficulty then [*sic.*] when observed at Dr. Nims' office. * * *"

{¶ 5} Midmark showed the surveillance videotape to Dr. Cunningham. Dr. Cunningham stated in a second report:

"In reference to the videotape of his surveillance from 08-15-89 until 08-29-89, this individual was found to be repetitively able to climb onto and off of a scaffold which was approximately at the height of his ears from the ground. It was also noted on the videotape that he was able to walk with and without the assistance of a cane on multiple occasions. He was frequently carrying a cane, but he did not always use a cane for ambulatory support. He was seen dragging a stepladder on one occasion. This videotape surveillance conclusively and rather graphically

supports my previous opinion that this individual's attempted exhibition of ability to move about, and his exhibited functional capacity when he was aware of being observed, was much less than was truly present when he was not aware of being observed."

{¶ 6} Dr. Cunningham, however, still assigned a fifty-percent permanent partial impairment to claimant's allowed conditions.

{¶ 7} Claimant, in the meantime, applied for permanent total disability compensation. Among the assertions made in his application were:

"[I have] [c]onstant pain that shoots into my hips, groin area, down [my] legs into my feet & toes. Pain shoots into my upper back & my head causing severe headaches. I lose the use of both legs at times & have fallen. I have to use 2 canes & a Taylor back brace. My legs & feet swell & hurt severely. I cannot lift. I have almost no endurance or cooridnation [*sic*] left. My wife has to help me in all my daily activities such as dressing, bathing[,] in & out of bed, my brace on & off & at times has cleaned me when I use the stool, I have back pain when I cough or sneeze. My back & legs hurt when I ride for a period of time. I can not bend, [and have] limited walking. I have trouble sleeping, I cannot stand or sit for long periods of time, I cannot squat * * *.

"I cannot do the following since my 1984 injury that I did before[:] I no longer swim, ride motorcycle, hunt, *trim trees & yard work*, take walks with my grand children, work out with weights, exercise, *home repairs*, repair & paint cars. * * * I have no social or social activities or others. [I] can no longer participate in * * * moving activities." (Emphasis added.)

{¶ 8} Claimant's application prompted an exam by commission specialist Dr. Paul F. Gatens, Jr. on March 23, 1990. In his reference to claimant's medical history, Dr. Gatens reported:

"In the file there is an x-ray of the low back dated 1976 showing some osteoarthritis at the level of L3. There is some osteoarthritis at the level of L2. It

is noticed that the osteoarthritis of L2 is not present on previous films in 1973. X-rays of the low back in 1984 showed a normal coccyx. It also described malalignment of the level of L2 and L3 with osteoarthritis. It was felt on these films that the malalignment did compromise the vertebral canal. This was suggestive of a first degree spondylolisthesis. A CAT scan of the lumbosacral spine in February of 1986 showed a herniated disc at L5, S1 compromising the left neural foramen. The claimant had a letter in which a doctor had recommended an L2-3 decompression and fusion with a probable Zilke pedicular instrumentation. In the file, it appeared that the Industrial Commission had approved surgery; however, the claimant says the company he worked for is self-insured and they had him see another physician who did not recommend the surgery. Consequently, the claimant has never [had] any surgery for this problem, and none is planned at the current time. The claimant indicates that he continues to have problems with his low back and pain in both legs, the left worse than the right. He says the legs can give out on him and he can fall to the ground. He uses bilateral canes when he walks short distances and uses a wheelchair for any longer distances. He indicates his wife has to help him get his clothes on and off and has to help him get in and out of bed. * * *

"The claimant was wheeled to and from the examination room in a wheelchair by his wife. He was carrying two straight canes. The claimant had to be dressed and undressed by his wife. His wife helped him get on and off the examination table. The claimant could not toe or heel walk. He could not do a partial squat and return. Palpation of the low back showed tenderness on the entire lumbosacral area. In terms of low back range of motion, he had less than 10 degrees in any direction. Reflexes in the lower extremities were 2 to 3+ at the knees and 1 to 2+ at the ankles. Manual muscle testing was invalid in that he showed 'breakaway' weakness of every muscle examined in both lower extremities.

Sensation to light touch was described as decreased in a nonphysiologic pattern involving the entire right leg, groin to foot, compared to the left * * * .

"* * *  During today's physical exam, it was very difficult to evaluate the physical findings since the subjective complaints seemed to outweigh the objective findings.  There, however, has been objective evidence of an L5-S1 herniated disc on the left in 1986.  Based on my examination and review of the file, it would be my opinion that the claimant's allowed industrial claims involving his low back do prevent him from returning to his former position of employment.  In my opinion, this inability to return to his former position of employment is permanent.  I do not, however, feel that he has a permanent and total impairment.  In my opinion, the claimant could perform work in the sedentary strength physical capacities provided he could be provided with a handicapped parking space within reasonable proximity to his work site.  If the claimant is indeed not going to have any surgery, then it would be my opinion that he has reached maximum medical benefit for his allowed industrial claims.  Based on my examination and review of the file, it would be my opinion that the claimant has a permanent and partial impairment related to all of his allowed industrial claims involving his low back of 60% of the body as a whole.  The other question I am asked is in terms of rehabilitation potential.  At this point in time, it would be my opinion that the claimant would not really benefit from rehabilitation services, and I would not recommend them.  The only program that might be of any possible benefit to him would be a vocational evaluation for jobs in the sedentary strength physical capacities, but at this point in time I would not be sure the claimant would either be interested in such a program or benefit significantly from it."

{¶ 9} In November 1990, surveillance of claimant again resumed.  No activity was observed on November 6.  The next day, the following entries of note were made:

7

"9:40 a.m. We drive by the residence and positively identify subject * * *. Subject is raking leaves * * *. He is also observed carrying a large dark plastic bag full of leaves over his right shoulder. He walks to the curb and dumps the leaves in a pile next to the roadway. He is not using a cane or walker.

"10:35 a.m. Subject continues raking leaves and working in the yard, carrying bags of leaves to the street.

"* * *

"11:20 a.m. Subject is still in the yard walking around, raking leaves and carrying large plastic bags of leaves and debris to the front of the residence near the roadway and dumping them into a pile. At no time has he used a cane or walker during this activity. Subject walks at a slow pace. We are able to document some of this activity on video tape. The female individual, believed to be his wife, is also raking leaves and pushing a power mower with a bag attachment.

"1:35 p.m. We observe the subject next to the roadway, dumping leaves.

"2:52 p.m. Subject is observed in front of the residence with a garden hose, sprinkling the pile of leaves next to the roadway.

"3:15 p.m. Subject is observed pushing the mower in the rear yard, next to the garage.

"3:20 p.m. Subject continues to push the mower in the rear yard. * * *"

{¶ 10} Two days later, investigators reported:

"11:50 a.m. Subject and wife are seen in the front yard. * * * He and his wife are again raking leaves. Subject uses both hands to rake the leaves, and no cane is visible. He appears to have no difficulty in walking.

"12:20 p.m. Subject and his wife are still in the yard raking and doing other work * * *.

"12:23 p.m. Subject walks from the garage, using what appears to be a cane in his right hand.

8

"12:25 p.m. Subject is now seen carrying a 6-7 ft. stepladder, using his right arm and hand. His wife walks beside him. He places the ladder next to the large tree in front of the residence, climbs to the top of the ladder without any assistance, and trims some top branches from the tree, with his wife holding the ladder to steady it. He then climbs back down, folds up the ladder and carries it back around the residence with no help. He does not have a cane during this activity. * * *"

{¶ 11} On August 15, 1991, the first of three permanent total disability hearings took place. On this date, the hearing was quickly adjourned and reset, following allegations by claimant's counsel that the surveillance tapes had been prejudicially edited. At no point during this hearing did Midmark's counsel ask that commission specialist Gatens be required to view the tape. Midmark's counsel also made no such request at the next hearing on October 16, 1991. During that session, the video was shown and commentary provided by one of the investigators. Claimant also testified in response to the tapes:

"Mr. Larrimer [claimant's counsel]: Mr. Sergent, you have had a chance to review that film. Was that you in the film?

"Mr. Sergent: Yes, it is.

"Mr. Larrimer: Can you describe to the members of the Commission what was the activity and why you were doing it?

"Mr. Sergent: We had some window air conditioners in our windows several years earlier --

"Mr. Larrimer: I don't need a real detailed history of the home. What was the specific activity on this particular day? Why were you doing it?

"Mr. Sergent: Having the end of the house repaired because of water damage. The contractor was going to put aluminum over the windows. He had bent some aluminum like this and he wanted me to measure them on the window. There were five windows. That is what I was doing, measuring the aluminum, cutting it to length.

"Mr. Larrimer:  Was that the only activity you did in regard to the windows?

"Mr. Sergent:  I punched some putty off so the thing could fit flat.

"Mr. Larrimer:  You were seen sitting on a scaffold.  Did you construct the scaffold?

"Mr. Sergent:  No.

"Mr. Larrimer:  Who did?

"Mr. Sergent: Contractor.  This work, it was six, seven hours of stopping, laying down, and I would take medication.  As far as walking and canes, sometimes I use one, sometimes I can walk without using any.  Sometimes I have to have a wheelchair.  It depends on my condition, how the medication is timed.  I think it is a Class II substance.

"Mr. Larrimer:  In terms of raking the leaves, how many bags do you think you carried during the course of two days?

"Mr. Sergent:  It was several bags but they were light, two, three pounds maybe.  I didn't run with them no hundred yard dash.

"Mr. Larrimer:  The investigator suggested that you brought one out every four minutes.  Is that accurate?

"Mr. Sergent:  No.

"Mr. Larrimer:  One every four minutes if you work six hours, that would be 90 bags.  Does your yard contain 90 bags of leaves?

"Mr. Sergent:  No.  He took out in the film where the wife had a vacuum.  It was not a lawn mower.   It was a vacuum."

{¶ 12} On January 3, 1992, the commission found claimant to be permanently and totally disabled.  Consequently, Midmark filed a mandamus action in the Court of Appeals for Franklin County.  Pursuant to the parties' stipulation, the court, on June 26, 1992, dismissed Midmark's mandamus complaint and the commission ordered the matter to be rescheduled for a third hearing.  At this hearing on September 21, 1992, Midmark's counsel, for the first time, argued that Dr.

10

Gatens should be required to issue an amended report based upon a viewing of the videotape.

{¶ 13} The commission ultimately refused Midmark's request, and on October 20, 1992 again found claimant to be permanently and totally disabled. The commission wrote:

"* * * This order is based particularly upon the report of Drs. [*sic*] Gatens, evidence in the file and/or evidence adduced at the hearing.

"It is specifically noted that claimant is 56 years of age, has a 7th grade education and has a work history of unskilled labor with no special training or vocational skills that would be transferrable to sedentary occupations. Dr. Gatens opined that Mr. Sergent would not really benefit from rehabilitation services and that he would not recommend them. The members of the Commission have viewed the video tape evidence submitted by the employer at the hearing, and Mr. Mayfield has viewed the full length version of the video tape evidence, following the hearing. The Commission is of the opinion that the video tape does not support a conclusion that the claimant herein is capable of sustained remunerative employment. The Commission is, therefore, of the opinion that these disability factors, when combined with the relatively high rate of medical impairment found by Dr. Gatens (60%), effectively preclude any sustained remunerative employment, and that the claimant herein is, therefore, permanently and totally disabled."

{¶ 14} Midmark filed a complaint in mandamus in the Court of Appeals for Franklin County, alleging that the commission abused its discretion in awarding permanent total disability compensation. The appellate court, fearing that Dr. Gatens may have been mislead by claimant's exaggerated presentation, vacated the commission's order. It directed the commission to "order a new examination of Mr. Sergent by a commission orthopedic specialist, preferably Dr. Gatens. The commission orthopedic specialist should have the videotape of Mr. Sergent's actual physical activities available for review in conjunction with the examination.

Following receipt of a report in regard to the new examination and any other medical evidence the commission deems appropriate, the commission should then determine whether Mr. Sergent is entitled to an award of permanent total disability compensation and enter an appropriate order in regard to that determination."

{¶ 15} The cause is now before this court upon appeal and cross-appeal as of right.

———————————

*Pickrel, Schaeffer & Ebeling Co., L.P.A., David C. Korte* and *Mary L. Biagioli*, for appellee and cross-appellant.

*Larrimer & Larrimer* and *David H. Swanson*, for appellant and cross-appellee.

———————————

*Per Curiam.*

{¶ 16} Precipitating this dispute are the Gatens and surveillance reports. From this evidence, two issues arise: (1) Was the commission compelled to have Dr. Gatens view the videotape and prepare an amended report? and (2) Did the commission err in subsequently relying on the Gatens report? Midmark argues that the surveillance showed claimant capable of a wider variety of activity than he alleged in his application. In Midmark's view, the medical opinion rendered by Dr. Gatens without the benefit of videotape viewing was inherently unreliable, because the report was so tainted as to demand some sort of remedial action, either by amendment or disqualification. In this case, we agree with the commission's decision.

{¶ 17} Claimant did exaggerate his incapacity to examining physicians. At least two examiners felt that claimant was not completely forthright in his medical presentation. Surveillance information, moreover, contradicted many of the assertions made in claimant's permanent total disability application. This inconsistency, however, means little unless it contradicts claimant's contention that

he cannot work or Gatens's conclusion that he is limited to sedentary work. The surveillance material does neither.

{¶ 18} First, the material does not establish a medical capacity for work greater than sedentary. It simply shows claimant walking unassisted or doing fairly unstrenuous domestic chores. Moreover, the objective, documented presence of spondylolisthesis and herniated disc, as discussed by Dr. Gatens, belies an assertion that his opinion was based solely on claimant's exaggerated subjective complaints. Interestingly, Dr. Cunningham, who evaluated claimant on Midmark's behalf, saw the videotape and still assessed a fifty-percent permanent partial impairment—only ten percentage points removed from Dr. Gatens's sixty-percent figure.

{¶ 19} Second, these documented activities, even if deemed inconsistent and work-amenable, do not establish that claimant can do *sustained* remunerative employment. Midmark's investigation spanned approximately fifteen months, yet it could show only five days in which claimant was performing allegedly questionable activities. There is no evidence of claimant's performing even any medium-exertion labor, nor is there any evidence of claimant's doing the recorded activity on anything other than rare occasions. The surveillance package, therefore, proved very little. As such, the commission did not abuse its discretion in accepting the Gatens report as valid.

{¶ 20} Midmark's assertion of commission error is further undermined by Midmark's own inaction. Midmark, pursuant to Ohio Adm. Code 4121-3-09(B)(5), could have moved to depose Dr. Gatens in an effort to clarify his perceptions. It did not do so. Midmark's response that its investigation was not finished when Gatens issued his report ignores that the first period of surveillance was complete at that time. Thus, evidence of alleged medically inconsistent activity already existed and could have prompted a timely request. Surveillance information from the first period alone was enough to generate a video review by Dr. Cunningham. Midmark could have done the same with Gatens.

**{¶ 21}** We thus find that the commission did not abuse its discretion in not requiring that Dr. Gatens view the videotape and in relying on his report. The report is "some evidence" supporting the commission's order.

**{¶ 22}** The judgment of the court of appeals is hereby reversed, and the order of the commission is reinstated.

*Judgment reversed.*

*and order reinstated.*

MOYER, C.J., DOUGLAS, RESNICK, F.E. SWEENEY, PFEIFER, COOK and LUNDBERG STRATTON, JJ., concur.

———————————