DECISION
{¶ 1} Relator, Terry Tharp, has filed this original action in mandamus requesting this court to issue a writ of mandamus ordering respondent Industrial Commission of Ohio to vacate its order denying relator's application for permanent total disability compensation and to enter a new order granting said compensation.
 {¶ 2} This court referred the matter to a magistrate, pursuant to Civ.R. 53(C) and Loc.R. 12(M) of the Tenth District Court of Appeals, who issued a decision, including findings of fact and conclusions of law. (Attached as Appendix A.) The magistrate determined that relator had failed to meet his burden of establishing an abuse of discretion by the commission and that this court should deny the requested relief.
 {¶ 3} No objections were filed to the decision of the magistrate.
 {¶ 4} Finding no error or other defect on the face of the decision of the magistrate, pursuant to Civ.R. 53, we adopt the decision of the magistrate as our own, including the findings of fact and conclusions of law contained in it. In accordance with the decision of the magistrate, the requested writ is denied.
Writ denied.
BROWN and KLATT, JJ., concur.
 APPENDIX A {¶ 5} In this original action, relator, Terry Tharp, asks this court to issue a writ of mandamus compelling respondent Industrial Commission of Ohio ("commission") to vacate its order denying compensation for permanent total disability ("PTD") and to issue an order granting the requested compensation.
Findings of Fact:
 {¶ 6} 1. In 1984, Terry Tharp ("claimant") suffered injuries in an industrial accident while employed as a machinist performing heavy work. His workers' compensation claim was allowed for numerous conditions of the left leg, left foot, left shoulder, lumbar spine and lumbosacral spine, as well as aggravation of preexisting depression.
 {¶ 7} 2. Claimant returned to his employer but worked as a forklift operator. He subsequently left that employment and studied electronics and computers. He then worked as an electronics technician for about six years after which he took a position with a computer store that involved building computers from scratch, loading and testing software, repairing computers, and diagnosing problems when customers brought computers into the store. Claimant ceased working on January 31, 2000.
 {¶ 8} 3. In July 2001, claimant filed a PTD application, indicating that he was 46 years old and had attended college for about one and one-half years.
 {¶ 9} 4. In September 2001, claimant was examined on behalf of the commission with regard to his physical conditions by James T. Lutz, M.D., who reported that claimant was able to perform routine housework such as vacuuming and was able to drive and take care of a new baby that he and his wife had adopted, including taking the child for walks. Dr. Lutz reported his clinical findings and then opined that claimant had a permanent partial impairment of 21 percent and could perform sedentary work.
 {¶ 10} 5. In October 2001, claimant was examined on behalf of the commission by Donald L. Brown, M.D., with regard to the aggravation of preexisting depression. In reviewing claimant's history, Dr. Brown noted claimant's hospitalizations due to seizures caused by epilepsy, diagnosed when he was 11 years old. Claimant said that he had a poor memory and that "everybody blames it on that." Claimant also stated that he has had some dizzy spells over the years that were attributed to his epileptic condition and recently had been told of two blackouts of which he had no recollection. Dr. Brown noted that James R. Hawkins, M.D., during his examination, observed indications of a petit mal seizure or some form of seizure equivalent.
 {¶ 11} Claimant told Dr. Brown that, at around age 21, he engaged in some drinking and using drugs. He stated that he was charged with possession of marijuana. Claimant also said that he was arrested twice for domestic violence, for which he was incarcerated both times. After being incarcerated the second time for six months, claimant said he entered an anger management program on his own and received psychological treatment, which helped him tremendously. He said that he and his wife get along well since then.
 {¶ 12} Claimant also said that his memory problem stemmed from an incident when he was around age 21 and was beginning a seizure, and the police thought he was drunk and beat him up, resulting in a ten-day hospitalization in the intensive care unit.
 {¶ 13} Dr. Brown also commented:
 {¶ 14} "He has a prior history of depression. Around age 13, he apparently got depressed and thought about jumping out of a window but fell out of it instead fracturing his left foot and then a week later overdosed. He was hospitalized at UC Hospital for apparently about 2 mos. and after that in outpatient therapy for awhile indicating that `they didn't help with my anger problem back then.' This is when he indicated that it became an issue again after he married. Previous reports seem to document the problem with anger throughout his childhood and adolescence. He says that all of his siblings have experienced depression as well as suicidal ideation. He also can see where some of them may have had ADHD symptomatology. He indicated that he had problems throughout his life with short attention span, motor restlessness, and difficulties with his memory which seemed to `get worse' over time. * * *"
 {¶ 15} Dr. Brown inquired about Attention-Deficit Hyperactivity Disorder ("ADHD"), eliciting the following information:
 {¶ 16} "* * * He said his 19 yr. old son * * * was diagnosed has having ADHD when younger and now is also being treated for bipolar disorder. He also has some type of epileptic condition. His 18 yr. old son was treated for ADHD but has responded positively and is doing well. I asked him if he ever though that he might have ADHD and he said he has though at times that he might have. * * *"
 {¶ 17} Dr. Brown reported another hospitalization in about 1994 after he took a bunch of pills due to pain and because he was separated from his wife. When asked if he was currently depressed, claimant said that he did not think so but might be depressed without realizing it. He said he no longer had crying spells or thoughts about killing himself. When asked if he got nervous, claimant answered that, in some ways, he was "a little nervous" because, when he was growing up, he never could measure up to his parents' expectations, and he tried to be like his twin brother but just gave up.
 {¶ 18} Claimant said he has a lifelong phobic fear of heights and that he gets anxiety attacks but not true panic attacks. Claimant also stated that he suffered from hot flashes that had been attributed to his epilepsy. Claimant denied obsession, compulsions, and excessive worry, although he had guilt feelings about the domestic violence against his wife in the past. He said he was in better control of his temper than in the past but could be reactive; claimant said that, while he did not always respond in a rational manner, he was "1,000% better." He also stated that he was now more communicative and getting away "from the backward stuff" and now feels better about himself.
 {¶ 19} Dr. Brown reported that, during the examination, claimant related in a cooperative, friendly manner and handled interpersonal communication well, smiling frequently and able to laugh. Speech was coherent, spontaneous, and goal-directed. There was no evidence of thought disorder, hallucinations, or delusions. Affect was somewhat bland but consistent with the content of thought. Dr. Brown found "no objective evidence of anxiety or depression."
 {¶ 20} Claimant was oriented to time, place, person, and purpose of the examination, and he seemed to be of average or low-average intelligence. He was able to comprehend and reason during the examination. Attention span and ability to concentrate were within normal limits during the examination, and memory was intact for recent and remote events. There was no evidence of organicity.
 {¶ 21} In summarizing his conclusions, Dr. Brown noted at the outset that claimant had a history of significant developmental trauma, with longstanding feelings of insecurity and inadequacy, and that claimant had struggled throughout his life. Dr. Brown discussed his conclusions as follows:
 {¶ 22} "* * * He developed epilepsy at an early age with significant emotional impact upon him and especially in conjunction with his academic troubles and his chronic sense of failure. He apparently grew up in a rather violent household and according to his twin was frequently scapegoated resulting in angry outbursts of his own that became most prominent during the early years of his marriage and continued until he went into an anger management program. He has either consciously suppressed or unconsciously repressed much of his memories of his childhood though his amnesia could partially be mediated by his epileptic condition which also could have impacted his tendency towards anger and the other cognitive deficits he is reporting at this time. I suspect that he has throughout his life had undiagnosed Attention-Deficit Hyperactivity Disorder, combined type and some underlying form of mood disorder or again the condition could have been aggravated by his epileptic condition. I feel that his history is consistent with long-standing anxiety, depression, and low self-esteem plus his life has been impacted by all the other factors noted above and that the aggravation of his preexisting depression caused by the effects of his industrial injury has not been a major factor and would suggest that as he has felt stress at various work situations that he has tended to withdraw from that stress as he may have from the stress of his family of origin and which became a personality trait for him but now is more comfortable at home and taking care of his grandson. * * *"
 {¶ 23} Dr. Brown stated that he did not agree that the problems with memory, irritability, and decision-making were causally related to the industrial injury but were caused by factors before the injury. He concluded that the "allowance of aggravation of preexisting depression would not prevent him from returning to his former position of employment or other forms of sustained remunerative employment." Dr. Brown opined that claimant's depression had improved as a result of taking care of his grandson, whom they had adopted. Dr. Brown opined that claimant had a Class II level of psychological impairment, which was "moderate" and estimated impairment at 25 percent.
 {¶ 24} 6. In November 2001, claimant filed a May 2001 report from a psychologist, Jennifer J. Stoeckel, Ph.D., who set forth a history as well as her evaluation of his mental status, including results of the Minnesota Multiphasic Personality Inventory-2 ("MMPI-2") test she administered. Dr. Stoeckel concluded that "Mr. Tharp would be considered totally disabled in light of his physical and emotional impairment and that this disability would likely persist for a minimum of twelve months," and that claimant was not "emotionally capable of managing" employment even if sedentary.
 {¶ 25} 7. Other reports in the file include reports from John Roberts, M.D., James Hawkins, M.D., Giovanni Bonds, Ph.D., and Joseph Thomas, M.D.
 {¶ 26} 8. On December 3, 2001, an employability assessment was provided by Donna B. Taylor, who concluded that claimant's age was not a barrier to employment. She opined that education and work history were positive factors. Ms. Taylor determined that claimant had skills in precision wiring, quality assurance, and product testing that would transfer to light and sedentary levels of exertion. She further opined that claimant's post-secondary education increased his marketability.
 {¶ 27} Ms. Taylor concluded that, if the commission accepted the functional capacities as set forth by Dr. Brown, there were several occupations that claimant could perform immediately and additional jobs that he could perform with brief training. If the commission accepted the functional capacities as found by Dr. Lutz, there were also occupations that claimant could perform immediately and with training. Ms. Taylor concluded that if the commission accepted the opinion of Dr. Roberts or Dr. Hawkins, claimant was not employable in any occupation. Further, Ms. Taylor concluded that, if the commission accepted the functional capacities as assessed by Dr. Stoeckel, claimant could probably obtain a job after 12 months but would not be able to sustain employment over time. Finally, Ms. Taylor concluded that, if the commission were to accept the opinion of Dr. Thomas, an orthopedist, claimant could perform the same jobs as listed for Dr. Lutz's opinion.
 {¶ 28} Ms. Taylor noted that claimant's description of his prior jobs indicated that he could not return to his previous employment, which had required substantial standing, and she also noted that there was no indication that he had attempted any sedentary employment.
 {¶ 29} Ms. Taylor provided the following discussions in response to questions from the commission:
 {¶ 30} "* * * He had pre-existing conditions of Depression and a seizure disorder, and was granted Handicap Reimbursement at 50 % for psychoneurotic disorder and epilepsy. (There is an adolescent history of a suicidal attempt and psychiatric hospitalizations, although he currently receives no mental health treatment.) He also had a fractured left foot as an adolescent when he fell from a window while contemplating suicide. Dr. Brown suspected an undiagnosed Attention-Deficit Hyperactivity Disorder. * * *
 {¶ 31} "* * *
 {¶ 32} "Academic remediation should not be necessary based upon the claimant's college level work. Dr. Brown and Dr. Hawkins opined that Mr. Tharp was of average to low average intelligence, and that his attention span and memory were intact, so learning new job skills should not be difficult, despite his subjective complaints of memory problems (dating back to age 21 when he was reportedly assaulted by police officers.) Dr. Brown found concentration was preserved, but Dr. Hawkins did not, and also noted that the claimant's pace, persistence, and the ability to adapt to stressful situations had declined.
 {¶ 33} "* * *
 {¶ 34} "Although he is allowed to drive, he should avoid unprotected heights due to his seizure disorder. He would be unable to obtain employment in jobs requiring a clean police record as he has been convicted of drug possession (1978), and was incarcerated for domestic violence 2 or 3 times. (Reportedly, he has had a lifelong problem with anger control, although this has improved since he participated in an anger management class.) Mr. Tharp performs his activities of daily living, and assists with light household chores (although this is contradicted by Dr. Stoeckel who was also unaware of the extent of his legal history). Mr. Tharp spends most of his time caring for his adopted grandson who is under 2-years old. (This includes taking him for walks.) Dr. Stoeckel administered the Minnesota Multiphasic Personality Inventory-2 to the claimant, and his profile suggested th[at] he was histrionic, and would tend to over-react to minor stressors in his environment. Therefore, inherently stressful tasks should be avoided."
 {¶ 35} 9. On December 21, 2001, Dr. Stoeckel provided an additional report in which she explained why claimant could not psychologically sustain competitive employment, and she clarified that the disability was permanent in that it would last for a minimum of 12 months without any improvement.
 {¶ 36} 10. In February 2002, the commission granted leave for claimant to take Dr. Brown's deposition, based on the disparity between his opinion and Dr. Hawkins' opinion, and the deposition proceeded in May 2002. When asked to account for the symptoms observed by Dr. Hawkins eight months before his own examination, Dr. Brown opined that claimant's beneficial relationship with his grandson could account for the improvement during the eight-month period between the two examinations. Dr. Brown explained that claimant seemed to be more positive about the future since he began spending time with his grandson, which Dr. Brown thought was giving claimant a sense of purpose in life. Also, he acknowledged that he and Dr. Hawkins may simply have come to different conclusions. He noted that Dr. Hawkins appeared to differ as to which symptoms were causally related to the industrial injury and which symptoms were unrelated. For example, Dr. Brown stated that "some of the symptoms that [claimant] presented, I think, are from factors totally separate from his depression, which was not Dr. Hawkins' opinion. * * * So, I'm trying to give my view of how I saw it."
 {¶ 37} Dr. Brown acknowledged that, in his written report, he attributed some of the current behavioral symptoms to preexisting psychological or medical problems for which claimant was treated prior to his industrial injury. He opined that some of the depression was unrelated to the industrial injury and, also, that some of the current symptoms were caused by conditions other than depression.
 {¶ 38} When Dr. Brown was asked whether he tried to separate the preexisting level of depression from the level of the aggravation of preexisting depression, Dr. Brown answered, in part:
 {¶ 39} "Well, I don't tend — I do that to a degree, but I don't look at it that way. I try to look at the degree of depression and then try, in my discussion, to describe what I think may have contributed to this depression. And then I feel it really boils down to an administrative decision, for somebody to look at this data and the other data and say, This is what makes sense to me.
 {¶ 40} "So you know, it used to be, way back, you tried to say, you know, ten percent to this and ten percent to that. That's really not possible in a lot of situations. So I've been more inclined over the last few years to rely on the discussion and then give an opinion on a percentage as requested.
 {¶ 41} "I did seem to be trying to parse things here a bit one to the other in looking at my discussion.
 {¶ 42} "* * *
 {¶ 43} "So I'm trying to give my view of how I saw it. The claimant really had a lot of depression prior to his injury and, obviously, pain would cause people to be more depressed.
 {¶ 44} "You know, so I don't know that I can put a percentage on it, but I did say I didn't think that the majority of his depression was the result of the injury itself. * * *" Depo. at 15-17.
 {¶ 45} When Dr. Brown was asked about his assessment of "moderate impairment" and whether he believed that claimant actually had a higher percentage of impairment but that the increased impairment was due to the preexisting factors rather than the aggravation, Dr. Brown answered that he assessed the moderate level of impairment considering all the factors. He referred back to his prior discussion, indicating that he will give a percentage estimate as required but relies on his discussion of all the contributing factors, leaving it to the commission to determine how much disability should be attributed to the different factors.
 {¶ 46} Dr. Brown acknowledged that a moderate impairment of 25 to 30 percent is compatible with some, but not all, useful functioning. In regard to his conclusions, Dr. Brown explained that claimant described himself as feeling down and tired but not suicidal. Claimant was able to drive and take care of himself and his grandson. Claimant said he had little social life but had described himself as having never had much social life in the first place. Dr. Brown explained that it would be reasonable to assume that, when a depressed person is in physical pain, there would be some regression, possibly some worsening of depression. However, he stated that, during the examination there was no objective evidence of depression. Claimant smiled frequently, laughed, and was friendly and cooperative. He reported some symptoms of depression but indicated that he was not as depressed as he formerly had been.
 {¶ 47} In addition, Dr. Brown noted claimant's statements about not being able to concentrate and focus, but he commented that "I didn't personally think that was probably the depression. I felt that was undiagnosed ADHD." Dr. Brown explained that, in his practice he worked with children, adolescents and adults who have ADHD, so he was more likely to ask questions about ADHD than the average psychiatrist or psychologist. He said that some examiners do not set forth histories that are equally detailed. Dr. Brown refused to agree that his comments were speculative, explaining as follows:
 {¶ 48} "Well, you know, it was never diagnosed. He gave me a family history of ADHD. He gives me ADHD symptoms during his childhood and adolescence when he was in school. It may well have contributed to some of his academic problems.
 {¶ 49} "I'm inclined to think it's more than a suspicion, but that's my way of thinking." Depo. at 21.
 {¶ 50} Last, Dr. Brown reiterated that a return to work could improve claimant's sense of purpose and self-esteem, but he acknowledged that if an injured worker is unable to work, it can affect him emotionally and cause him to be depressed.
 {¶ 51} 11. In August 2002, the PTD application was heard by a staff hearing officer ("SHO"), who accepted the medical opinion of Dr. Lutz as to claimant's physical capabilities. With respect to the claimant's psychological condition, the SHO discussed the opinion of Dr. Brown as follows, in pertinent part:
 {¶ 52} "* * * Dr. Brown completed an Occupational Activity Assessment form which he attached to that report wherein he indicated that the claimant is capable of returning to any former position of employment as well as any other form of sustained remunerative employment considering the allowed psychological condition. The claimant was permitted to depose Dr. Brown. In the deposition, Dr. Brown clarified that he considered the claimant's psychological functioning and impairment without separating the pre-existing and current levels of depression. Dr. Brown stated that he rated the claimant's level of depression, considering all of the factors, regardless of what pre-existed the injury. He further clarified that the claimant's moderate level of impairment considering the allowed psychological condition is compatible with some, but not all, useful functioning. Dr. Brown opined that the claimant is able to take care of himself, drive an automobile, and take care of his needs on a daily basis. He further opined that the claimant has less socialization due to his absence from work. Dr. Brown further opined that the claimant may suffer deterioration were he to be placed in a work environment and experience physical pain. However, he further opined that a return to work may benefit the claimant psychologically by improving his perception of his self-worth."
 {¶ 53} The SHO concluded that claimant was restricted to sedentary employment within the limitations stated in the definition of such employment, and further found that the allowed psychological condition did not prevent claimant from returning to sustained remunerative employment that he was otherwise qualified to perform. Next, the SHO turned to the nonmedical factors and concluded that claimant was able to engage in sustained remunerative employment as follows:
 {¶ 54} "An employability assessment of the claimant was performed by Ms. Taylor at the request of the Industrial Commission. Ms. Taylor opined that based on the residual functional capacities as expressed by Dr. Brown and Dr. Lutz, the claimant has the following employment options: small products assembler, surveillance system monitor, product inspector, and cashier. Ms. Taylor noted the claimant's age of 46 and stated that he is categorized as a younger person. Ms. Taylor opined that such age is not a limiting re-employment factor. She further noted the claimant's G.E.D. certificate and attendance of 1-1/2 years of college. Ms. Taylor noted that the claimant became a computer technician through training. Ms. Taylor opined that the claimant's post-secondary education increases his marketability over less educated workers. She further reviewed the claimant's work experience and opined that the claimant acquired skills in his past employment, such as in precision wiring, quality assurance, and product testing. Ms. Taylor further opined that the claimant should not need academic remediation based on his past academic experience.
 {¶ 55} "The Staff Hearing Officer finds that the claimant is 46 years old, has a high school level education with 1-1/2 years of college training and work experience as a computer technician, electric motor assembler and tester, machine threader and machinist. The Staff Hearing Officer finds that the claimant's age is an asset which would enable him to adapt to new work rules, processes, methods, and tools involved in a new occupation. The Staff Hearing Officer further finds that the claimant's education is an asset which increases his marketability over less educated workers. The Staff Hearing Officer further finds that the claimant's work experience was performed at a skilled level of employment and provided the claimant with such transferable skills as: precision wiring, quality assurance, and product testing. Considering the claimant's age, education, and work experience in conjunction with the limitations related to the allowed conditions, the Staff Hearing Officer finds that the claimant is able to perform the occupations noted in the vocational report of Ms. Taylor such as: small products assembler, surveillance system monitor, product inspector, and cashier. Accordingly, the Staff Hearing Officer finds that the claimant is able to engage in sustained remunerative employment."
Conclusions of Law:
 {¶ 56} Claimant challenges the denial of PTD compensation, raising three issues: (1) that the commission abused its discretion in relying on Dr. Brown's report and testimony because his testimony was inconsistent, in that he repudiated his earlier opinions or rendered equivocal opinions; (2) that the commission abused its discretion in relying on Dr. Brown's opinions because he relied on the existence of a disabling nonallowed condition that had not been formally diagnosed and was merely speculative; and (3) that the commission abused its discretion in relying on Ms. Taylor's report because she relied on information in the claim file that the commission in its PTD order did not adopt.
 {¶ 57} Several established principles apply to the court's consideration. First, it is fundamental that the commission's award of disability compensation must be based exclusively on allowed conditions. E.g., State ex rel. Chrysler Corp. v. Indus. Comm. (1998),81 Ohio St.3d 158. In other words, an award of compensation cannot be based even in part on a nonallowed condition. See, e.g., State ex rel.Waddle v. Indus. Comm. (1993), 67 Ohio St.3d 452; State ex rel. EricoProducts, Inc. v. Indus. Comm. (1994), 70 Ohio St.3d 661. Accordingly, a medical report basing disability even in part on a nonallowed condition cannot constitute "some evidence" to support an award of compensation. E.g., State ex rel. Shields v. Indus. Comm. (1996), 74 Ohio St.3d 264,268.
 {¶ 58} However, the presence of a disabling nonallowed condition does not preclude a PTD award. Compensation may be awarded where allowed conditions support PTD regardless of the existence of a nonallowed condition that also causes impairment. The question for the commission is whether the allowed condition, in and of itself, resulted in PTD, independent of the nonallowed condition. Waddle; State ex rel. Nicholsonv. Copperweld Steel Co. (1996), 77 Ohio St.3d 193; State ex rel. QuartoMining Co. v. Foreman (1997), 79 Ohio St.3d 78; State ex rel. Byrd v.Am. Std., Inc. (1997), 78 Ohio St.3d 504.
 {¶ 59} For example, where a claim is allowed solely for an aggravation of a pre-existing condition, the commission may award compensation based only upon the allowed condition. Chrysler Corp.,
supra. That is, the commission may award compensation only where disability has resulted from the allowed aggravation of the preexisting condition. Id. at 167.
 {¶ 60} Depending on the facts in the individual case, an aggravation may or may not cause disability that is compensable. It is clear, however, that there are cases where the aggravation, in and of itself, renders the claimant disabled. Id. at 166-168. Where a physician renders an opinion that the allowed aggravation, in and of itself, has caused the claimant to be unable to work, the commission has discretion to accept the physician's opinion and attribute disability to the aggravation. Id.
 {¶ 61} With respect to the evidentiary value of medical reports, the magistrate notes that the commission is the finder of fact and has sole authority to determine the credibility and weight of the evidence, including medical reports. See, e.g., State ex rel. Burley v. CoilPacking, Inc. (1987), 31 Ohio St.3d 18; State ex rel. Teece v. Indus.Comm. (1981), 68 Ohio St.2d 165. However, in some circumstances, a medical report must be removed from evidentiary consideration because it cannot constitute "some evidence" as a matter of law. For example, a report may be barred from consideration where a reporting physician has not accepted the allowance of all conditions recognized in the claim, although a medical report is not barred from constituting "some evidence" because a doctor finds no current evidence of an allowed condition. Stateex rel. Foley v. Vulcan Mfg. Co. (1998), 84 Ohio St.3d 59; State ex rel.Domjancic v. Indus. Comm. (1994), 69 Ohio St.3d 693.
 {¶ 62} Sometimes the commission will explicitly state in its decision that it has rejected a report, either because it finds the report unpersuasive or because it believes that the report must be removed from evidentiary consideration as a matter of law. In other cases, the court in mandamus removes a report from evidentiary consideration because it cannot constitute "some evidence" as a matter of law. E.g., Shields, supra.
 {¶ 63} For example, a medical report based on nonallowed conditions, even in part, is not evidence on which the commission may rely, as indicated above. Further, a medical opinion cannot constitute "some evidence" if it is internally inconsistent or equivocal, and a medical opinion is fatally equivocal where the physician repudiates his earlier opinion or contradicts it in a later report or in deposition testimony. E.g., State ex rel. Owens-Corning Fiberglas Corp. v. Indus.Comm. (1994), 70 Ohio St.3d 263; State ex rel. Eberhardt v. FlxibleCorp. (1994), 70 Ohio St.3d 649; State ex rel. Lopez v. Indus. Comm.
(1994), 69 Ohio St.3d 445; State ex rel. Malinowski v. Hordis Bros.,Inc. (1997), 79 Ohio St.3d 342; Chrysler Corp., supra; State ex rel.Jennings v. Indus. Comm. (1982), 1 Ohio St.3d 101; State ex rel. Paragonv. Indus. Comm. (1983), 5 Ohio St.3d 72. However, when a doctor has made a statement that is uncertain or unclear, he may clarify it in a subsequent explanation, and the commission may rely on the medical opinion as clarified. E.g., Eberhardt.
 {¶ 64} The magistrate recognizes that there may be situations where an expert witness has relied on medical information or a medical opinion in the claimant's file. Where the information or opinions on which the expert has relied are subsequently rejected by the commission or are removed from evidentiary consideration by the court, the expert's opinion may also be subject to removal from evidentiary consideration, entirely or in part, depending on the circumstances. See State ex rel. Maxey v.MII Kiechler Mfg. Co., Franklin App. No. 02AP-129, 2002-Ohio-5966. For example, where a vocational expert bases part of her report on a medical report that the court later removes from evidentiary consideration, that part of the vocational expert's report cannot constitute evidence on which the commission may rely. Id.
 {¶ 65} In the present action, claimant argues that the medical opinion of Dr. Brown was equivocal, in that he repudiated earlier opinions or contradicted himself. The magistrate accepts that some statements made by Dr. Brown could appear to be somewhat unclear or equivocal when viewed in isolation. However, upon reading Dr. Brown's report and his deposition testimony in their entirety, and upon reading the other psychological reports in the record, the magistrate finds no basis to remove Dr. Brown's report from evidentiary consideration as a matter of law. Dr. Brown set forth in detail his findings and opinions, and the magistrate finds them sufficiently clear to permit consideration by the finder of fact.
 {¶ 66} The magistrate notes that Dr. Brown was asked a series of questions about separating the effect of the allowed aggravation of preexisting depression and the effect of the preexisting factors. Dr. Brown explained that, to him, this is more of a legal concept than a medical one, and he indicated that it can be difficult to give a medical opinion as to exactly how much of a person's functional impairment should be attributed to the allowed condition as opposed to a nonallowed or disallowed condition that is closely related. Dr. Brown explained that, formerly, doctors were asked to assess a percentage for different contributing factors but that he found that to be problematic. He indicated that he preferred to provide a thorough discussion of all the factors that he believed were contributing to the person's impairment and then let the commission ultimately determine how much, or the extent to which, the allowed conditions were responsible for disability. Dr. Brown explained the basis of his medical opinions in detail. For example, in his written report, he noted that claimant's memory problems had been attributed to his epilepsy and that claimant had recently been told he had suffered two blackouts of which he had no recollection. Further, claimant attributed his memory problems to an assault by police. In his written report, Dr. Brown also indicated that claimant had described symptoms of ADHD. When questioned about this in the deposition, Dr. Brown explained the basis of his belief that claimant suffered from undiagnosed ADHD, and he affirmed that it was "more than a suspicion."
 {¶ 67} In general, the court does not "second guess" medical opinions from medical experts and will remove a medical opinion from evidentiary consideration as having no value only when the report is patently illogical or contradictory even to a layperson, or for a similar patent defect such as relying on a nonallowed condition. See, e.g., Stateex rel. Young v. Indus. Comm. (1997), 79 Ohio St.3d 484; State ex rel.Consolidation Coal Co. v. Indus. Comm. (1997), 78 Ohio St.3d 176; Stateex rel. Taylor v. Indus. Comm. (1995), 71 Ohio St.3d 582; Lopez;Shields, supra. Overall, the magistrate finds Dr. Brown's explanations to be within the boundaries of reasonableness and consistency, and rejects the argument that his opinions must be removed from consideration as having no evidentiary value as a matter of law.
 {¶ 68} Next, the magistrate addresses the report of Ms. Taylor. Claimant argues that her report must be removed from evidentiary consideration because she relied on an MMPI-2 test administered by Dr. Stoeckel. The magistrate agrees that Ms. Taylor, in opining as to the type of jobs that would be appropriate for claimant, commented that claimant should avoid "inherently stressful tasks," and that she based this opinion at least in part on the MMPI-2.
 {¶ 69} The magistrate finds no improper consideration of Dr. Stoeckel's report by Ms. Taylor. In her employability assessment, Ms. Taylor noted that Dr. Stoeckel appeared to be unaware of some facts in claimant's history, and, accordingly, Ms. Taylor indicated that she did not accept some of Dr. Stoeckel's opinions. Nonetheless, Ms. Taylor did recite one of the results of the MMPI-2 administered by Dr. Stoeckel. However, Ms. Taylor provided her own interpretation of that score, setting forth the relatively obvious recommendation that claimant should avoid work that is inherently stressful. Given the record in this case, the magistrate sees no reason to remove Ms. Taylor's report from evidentiary consideration because she stated that the claimant should avoid inherently stressful work, based in part on an MMPI-2 score in claimant's file. This is not a case where the court has ruled that the Stoeckel report cannot constitute "some evidence" as a matter of law, nor is this a case where the commission expressly found the Stoeckel testing to be unreliable. Cf. Maxey, supra.
 {¶ 70} Claimant further challenges the job options that Ms. Taylor listed according to the various doctors' restrictions. With respect to this argument, the magistrate accepts the proposition that, where a vocational consultant has stated job options for claimant by listing job titles with accompanying code numbers from the Dictionary of Occupational Titles ("DOT"), and where the consultant also states that these jobs are within a doctor's medical restriction to sedentary work, and where a review of the cited job titles plainly reveals that these jobs require light or medium strength according to the DOT, then the court may find the consultant's list of job options to be internally inconsistent with the supposed reliance on the doctor's restrictions, and the list of job options must then be removed from evidentiary consideration. In other words, the court will remove from evidentiary consideration a vocational consultant's list of job options where the claimant establishes that the consultant has listed job options that, according to her own source, are plainly beyond the claimant's medical capacity as accepted by the consultant for that list.
 {¶ 71} Here, however, Ms. Taylor never said she was relying on the DOT. Accordingly, the magistrate rejects the argument that Ms. Taylor's list is defective because, according to claimant, jobs in the DOT that "may correspond to her listings" all require light strength.
 {¶ 72} Here, Ms. Taylor listed job titles and numbers, citing a source called "O*Net," which claimant states in mandamus is an internet site. Claimant provides copies from that website to support his claims. Claimant alleges, however, that Ms. Taylor's citations to code numbers from O*Net are factually incorrect. Claimant alleges that her code numbers do not correspond with classifications in O*Net, but, instead, Ms. Taylor's citations refer to labor classifications in another internet site called "Labor Market Information" or "LMI," which is maintained by the Ohio Department of Job and Family Services. Further, claimant asserts that LMI classifications do not include specific ratings for strength categories. If claimant is right, then it is not possible to determine, by reviewing the LMI classifications, whether Ms. Taylor's opinion is correct or incorrect that the listed jobs are within Dr. Lutz's limitation to sedentary work.
 {¶ 73} In an appendix to his brief, claimant provides numerous pages copied from the websites, including a page describing the "Occupational Code Crosswalk" and pages regarding "Data and Publications," "Analyses," "Occupations Wages," "Labor Force 
Unemployment," "Employment, Wages, Hours Earnings," "Occupational Employment Statistics," and a page headed "Occupational Codes, Titles, and Definitions with [illegible] to wages, skill sets and Career Tabloid."
 {¶ 74} The magistrate reaches several conclusions. First, even if the court accepts claimant's representations about these two websites and accepts claimant's documents attached to the brief, the documents establish at most that Ms. Taylor intended to cite LMI rather than O*Net because her numbers fit LMI classifications. Thus, claimant has proved at most that Ms. Taylor cited codes from LMI but mistakenly cited O*Net, which is simply a citational mistake. Claimant has not proved, however, that Ms. Taylor listed job options as sedentary that her own authority plainly states are not sedentary. Claimant has not proved that none of the jobs identified by Ms. Taylor are sedentary. In sum, claimant has not presented a clear defect in mandamus that requires the court to remove the Taylor report from evidentiary consideration as a matter of law.
 {¶ 75} Second, and in the alternative, the magistrate concludes that claimant should have presented this argument and these documents to the finder of fact in the first instance, or, in the alternative, claimant should have sought to take Ms. Taylor's deposition to clarify the actual basis of her opinions. See, generally, State ex rel. Kamp v.Miami Margarine Co. (June 19, 1997), Franklin App. No. 96AP-1317 (adopting Magistrate's Decision Apr. 30, 1997). If these documents and this information had been presented to the commission, either in the PTD hearing or in a request for deposition, the commission could have made findings of fact and the court would have a basis for review in mandamus. Instead, claimant asks the court to make determinations that should have been placed before the commission for determination in the first instance. In the alternative, claimant could have sought a deposition in which Ms. Taylor could have been challenged and given an opportunity to explain the basis of her opinions, as the claimant did inKamp.
 {¶ 76} In conclusion, the magistrate observes that the role of the court in a mandamus action is limited. An order supported by "some evidence" must be upheld, regardless of whether the record includes other evidence, greater in quantity and/or quality, that supports the contrary decision. State ex rel. Pass v. C.S.T. Extraction Co. (1996),74 Ohio St.3d 373, 376. In the subject order, claimant has not proved that the commission failed to cite "some evidence" in support of its decision. Accordingly, the magistrate recommends denial of the subject writ.
 {¶ 77} The magistrate concludes that claimant has not met his burden of proving an abuse of discretion by the commission and accordingly recommends that the court deny the requested writ.