[Cite as *State ex rel. Wayne Dalton Corp. v. Indus. Comm.*, 2017-Ohio-7736.]

IN THE COURT OF APPEALS OF OHIO

TENTH APPELLATE DISTRICT

State ex rel. Wayne Dalton Corporation,   :

        Relator,                :

v.                                :           No. 16AP-423

Industrial Commission of Ohio       :      (REGULAR CALENDAR)
and Candie Simon,

                             :

        Respondents.            :

                             :

D E C I S I O N

Rendered on September 21, 2017

**On brief:** *Krugliak, Wilkins, Griffiths & Dougherty Co., L.P.A., Edward D. Murray*, and *Aletha M. Carver*, for relator.

**On brief:** *Michael DeWine*, Attorney General, and *Amanda B. Brown*, for respondent Industrial Commission of Ohio.

**On brief:** *Brian, Zwick, Marchisio, Stone & Associates*, and *Richard F. Brian*, for respondent Candie Simon.

IN MANDAMUS
ON OBJECTIONS TO THE MAGISTRATE'S DECISION

DORRIAN, J.

{¶ 1} Relator, Wayne Dalton Corporation, filed an original action which asks this court to issue a writ of mandamus ordering respondent Industrial Commission of Ohio ("commission") to vacate the order of its staff hearing officer ("SHO"), which granted to respondent Candie Simon ("claimant") an award of permanent total disability ("PTD") compensation beginning April 6, 2015, and ordering the commission to find that she is not entitled to that compensation.

{¶ 2} Pursuant to Civ.R. 53 and Loc.R. 13(M) of the Tenth District Court of Appeals, this matter was referred to a magistrate who issued a decision, including findings of fact and conclusions of law, which is appended hereto.

{¶ 3} The magistrate recommended this court deny relator's request for a writ of mandamus. Specifically, the magistrate found: (1) the August 11, 2014 and April 6, 2015 reports of Dr. Mark Cecil provide some evidence on which the commission relied to support the finding that the allowed conditions alone preclude all sustained remunerative employment, and (2) the report of Dr. Nicholas Varrati provides some evidence on which the commission relied to support the finding that the allowed conditions alone preclude all sustained remunerative employment.

{¶ 4} Relator has filed the following three objections to the magistrate's decision:

[I.] The Magistrate erred in finding that Dr. Cecil's August 11, 2014, opinion was not equivocal and contradictory and concluding that Dr. Cecil's opinions constituted some evidence to be relied upon to support a finding of PTD benefits.

[II.] The Magistrate erred in finding Respondent Simon incapable of engaging in sustained remunerative employment based on the medical evidence and circumstances in the case.

[III.] The Magistrate erred in finding that Dr. [Varrati's] report could be relied upon to support a finding of PTD.

{¶ 5} The arguments presented in relator's three objections are not new and are essentially a reiteration of the same arguments previously made to and addressed by the magistrate. After a careful and independent review, for the reasons stated in the magistrate's decision, we do not find merit to relator's first, second, and third objections.

{¶ 6} In its first two objections, relator challenges the August 11, 2014 medical report of Dr. Cecil and argues the magistrate erred in concluding that the report was not equivocal and was not contradicted by the August 8, 2014 report of Dr. Cecil. Ultimately, relator argues that the magistrate erroneously found that these reports constituted some evidence upon which the commission could rely to support its finding of PTD.

{¶ 7} The Supreme Court of Ohio has observed that "[e]quivocation disqualifies an opinion from consideration and occurs 'when a doctor repudiates an earlier opinion,

renders contradictory or uncertain opinions, or fails to clarify an ambiguous statement.' " *State ex rel. George v. Indus. Comm.*, 130 Ohio St.3d 405, 2011-Ohio-6036, ¶ 15, quoting *State ex rel. Eberhardt v. Flxible Corp.*, 70 Ohio St.3d 649, 657 (1994). A medical report can be so internally inconsistent that it cannot be some evidence on which the commission can rely. *State ex rel. Lopez v. Indus. Comm.*, 69 Ohio St.3d 445 (1994); *State ex rel. Taylor v. Indus. Comm.*, 71 Ohio St.3d 582 (1995). However, a court will not second-guess a doctor's medical expertise to support a claim of internal inconsistency. *State ex rel. Young v. Indus. Comm.*, 79 Ohio St.3d 484 (1997).

{¶ 8} In addition, as noted by the magistrate, this court recently observed in *State ex rel. Sheller-Chiles v. Indus. Comm.*, 10th Dist. No. 13AP-245, 2014-Ohio-313, and *State ex rel. Bonnlander v. Hamon*, 10th Dist. No. 14AP-855, 2015-Ohio-4038, that this court's prior precedent has established that a work capacity of four or more hours per day constituted sustained remunerative employment.

{¶ 9} The magistrate found, based on this court's prior precedent, that Dr. Cecil's statement in the August 8, 2014 C-140 that claimant can work two hours per day and five days per week was not a statement that claimant is capable of sustained remunerative employment. He further found that the C-140 report is consistent with Dr. Cecil's opinion in his August 11, 2014 report that claimant is "permanently and totally disabled from sustained remunerative activity." (Appended Mag. Dec. at ¶ 26.) We agree. Dr. Cecil's August 11, 2014 report is not equivocal or ambiguous and does constitute some evidence on which the SHO could rely to find claimant permanently and totally disabled.

{¶ 10} Furthermore, in the June 17, 2015 order, the SHO relied "on the reports of Dr. Varrati and Cecil." (Appended Mag. Dec. at ¶ 42.) The SHO extensively discussed Dr. Cecil's treatment record of April 6, 2015 noting Dr. Cecil's finding therein that claimant "continues to experience intractable thoracolumbar pain which is difficult to control" and Dr. Cecil's continuing conclusion that claimant is permanently and totally disabled. (Appended Mag. Dec. at ¶ 42.) The SHO also ordered that PTD compensation commence effective April 6, 2015. Presumably, the SHO's reliance on the "reports" of Dr. Cecil included his April 6, 2015 treatment record. The magistrate found Dr. Cecil's April 6, 2015 report provided some evidence on which the commission relied to support the finding that the allowed conditions alone preclude all sustained remunerative

employment. Yet, relator did not object to the magistrate's finding regarding the April 6, 2015 report. Relator only challenges the August 11, 2014 report. Nevertheless, we agree with the magistrate that this is also some evidence on which the SHO could rely.

{¶ 11} Thus, we overrule the first and second objections.

{¶ 12} In its third objection, relator argues that Dr. Varrati's report did not include a complete or an accurate medical history. Relator asserts Dr. Varrati's report of his February 5, 2015 exam was deficient because he relied on the history provided to him by claimant, her subjective complaints, and her reports of self-function. Relator complains that claimant did not inform Dr. Varrati that: (1) she had been released to return to work by her physician of record, (2) she had been offered a job by relator, and (3) she had been actively engaged in a vocational rehabilitation program and job search. Relator further argues that the information which claimant did provide to Dr. Varrati was false and misleading as demonstrated by the surveillance and testimonial evidence provided at the hearing.

{¶ 13} The magistrate found that relator failed to pursue its remedy pursuant to Ohio Adm.Code 4121-3-09(A)(8) of seeking leave from the commission to take Dr. Varrati's deposition or submit interrogatories to Dr. Varrati regarding his examination of claimant on February 5, 2015, and regarding the surveillance evidence and other evidence of record at the time of his examination of claimant. Relator argues that a deposition was not necessary to demonstrate that claimant had provided incomplete, inaccurate, and misleading information to Dr. Varrati.

{¶ 14} We agree with the magistrate that relator could have requested permission from the commission to have Dr. Varrati sit for deposition or answer interrogatories. Nevertheless, we also note that relator mischaracterizes Dr. Varrati's report. Dr. Varrati considered not only claimant's subjective complaints and reports of self-function in concluding that she was unable to sustain remunerative employment. Rather, Dr. Varrati considered "the allowed conditions, the records [provided to him by the commission], the Injured Worker's subjective complaints and reports of self-function, and today's findings of localized tenderness over the T4-12 and L1-5 paravertebral musculature, and decreased range of motion." (Appended Mag. Dec. at ¶ 33.) The records provided to this court by the commission include the November 21, 2014 report from VocWorks which notes

claimant's participation in vocational rehabilitation and job search as well as the fact that relator had offered her employment. Presumably, Dr. Varrati was aware of these developments as he indicated he had reviewed all the commission's records which were provided to him.

{¶ 15} Furthermore, as to relator's claim that the surveillance video evidence demonstrates that claimant's self-report was false, we note that the SHO extensively discussed relator's video surveillance evidence and concluded that "the activities on the video tape are not so inconsistent as to impeach the medical evidence and restrictions outlined by Dr. Varrati and Dr. Cecil." (Appended Mag. Dec. at ¶ 42.) The SHO obviously carefully considered and weighed this counter evidence to Drs. Varrati's and Cecil's reports.

{¶ 16} This court will not determine that the commission abused its discretion when there is some evidence in the record to support the commission's finding. *State ex rel. Rouch v. Eagle Tool & Machine Co.*, 26 Ohio St.3d 197, 198 (1986). The some evidence standard "reflects the established principle that the commission is in the best position to determine the weight and credibility of the evidence and disputed facts." *State ex rel. Woolum v. Indus. Comm.*, 10th Dist. No. 02AP-780, 2003-Ohio-3336, ¶ 4, citing *State ex rel. Pavis v. Gen. Motors Corp., B.O.C. Group*, 65 Ohio St.3d 30, 33 (1992). We have determined that Drs. Cecil's and Varrati's reports constitute some evidence to support the commission's finding of PTD. As such, we will not, as relator suggests, reweigh the evidence of the surveillance video against Drs. Cecil's and Varrati's reports.

{¶ 17} Thus, we overrule the third objection.

{¶ 18} Following a review of the magistrate's decision, an independent review of the record, and due consideration of relator's objections, we find the magistrate has properly determined the facts and applied the appropriate law. Therefore, we overrule relator's three objections to the magistrate's decision and adopt the magistrate's decision as our own, including the findings of fact and conclusions of law therein. The requested writ of mandamus is denied.

*Objections overruled;*
*writ of mandamus denied.*

KLATT and SADLER, JJ., concur.

———————————

# APPENDIX

## IN THE COURT OF APPEALS OF OHIO

## TENTH APPELLATE DISTRICT

| | | |
|---|---|---|
| The State ex rel. Wayne Dalton Corporation, | : | |
| | : | |
| Relator, | : | |
| | : | |
| v. | : | No. 16AP-423 |
| | : | |
| Industrial Commission of Ohio and Candie Simon, | : | (REGULAR CALENDAR) |
| | : | |
| Respondents. | : | |
| | : | |

---

### M A G I S T R A T E ' S   D E C I S I O N

Rendered on April 5, 2017

---

*Krugliak, Wilkins, Griffiths & Dougherty Co., L.P.A.,* and *Edward D. Murray,* for relator.

*Michael DeWine,* Attorney General, and *Amanda B. Brown,* for respondent Industrial Commission of Ohio.

*Brian, Zwick, Marchisio & Associates,* and *Richard F. Brian,* for respondent Candie Simon.

---

### IN MANDAMUS

{¶ 19} In this original action, relator, Wayne Dalton Corporation ("Dalton"), requests a writ of mandamus ordering respondent, Industrial Commission of Ohio ("commission"), to vacate the June 17, 2015 order of its staff hearing officer ("SHO") that awarded to respondent, Candie Simon, permanent total disability ("PTD") compensation beginning April 6, 2015, and to enter an order denying the compensation.

Findings of Fact:

{¶ 20} 1. On April 12, 2011, Candie Simon ("claimant") injured her back while employed as a "receiving laborer" for relator, a self-insured employer under Ohio's workers' compensation law. The injury occurred while claimant was using a forklift.

{¶ 21} 2. The industrial claim (No. 11-817412) is allowed for "Ruptured Disc T12-L1; Post Thoracotomy Syndrome."

{¶ 22} 3. On May 16, 2012, claimant underwent back surgery performed by Mark Cecil, M.D. Dr. Cecil performed an "anterior corpectomy T12 vertebral body through left thoracotomy with partial resection of left tenth rib. There was allograft fusion with rib allograft T11 to L1 with placement of cage strut and anterolateral plates and screws and placement of a 28 French chest tube," as described in a September 6, 2013 report from Richard J. Reichert, M.D., who examined claimant on behalf of relator.

{¶ 23} 4. On November 4, 2013, claimant was examined by Dr. Cecil for post-surgical follow-up. In his office note of that date, Dr. Cecil wrote:

> RECOMMENDATIONS: The patient has had some difficulty in returning to work even on a sedentary basis. I had a long discussion with the patient about the natural history of her pathology particularly in regards to the setting of [the] Workers' Compensation claim. I would concur with Dr. Reichert that a sedentary occupation would be appropriate. I have encouraged the patient to attempt to return to a sedentary occupation full time though I have explained to her that I cannot guarantee that she will be able to remain in that setting, but I think an attempt ought to be made. Therefore, I have recommended returning her to work gradually to full time duty over the next 4-to-6 weeks beginning a 5 day work week at 4 hours a day x2 weeks, 6 hours a day x2 weeks and then return to full duty. I explained to the patient that pain management may also be efficacious in terms of providing her with some solutions to cope with what is likely to be some permanent pain.
>
> Unfortunately, if pain proves to be intractable then certainly one must consider the possibility of filing for disability compensation and I believe a compelling case could be made for that; however, it would be my hope that the patient could remain in the work force as I think ultimately for many reasons this would be better than disability compensation.

{¶ 24} 5. On February 3, 2014, claimant was again examined by Dr. Cecil for follow-up. In his office note of that date, Dr. Cecil wrote:

> She had an independent medical evaluation by Dr. Richard Reichert on 9/6/2013 and Dr. Reichert felt that the patient might be able to return to work in a sedentary capacity on a permanent basis. I felt that this was reasonable although I had some trepidation as regards the patient's fitness to return to work. The patient has made an attempt to return to work and is working three days a week, four hours daily. Her ability to work is limited by some unrelenting left-sided thoracic pain unassociated with neuropathic pain or radicular pain. Pain is worse with prolonged sitting and standing. It is relieved by supine posturing. She does utilize multiple medications to ameliorate the pain including the analgesic tramadol, the nonsteroidal anti-inflammatory Motrin and Cymbalta. Cymbalta is being used to address the neuropathic component of what is felt to be "post thoracotomy syndrome" or intractable intercoastal neuralgia. She has utilized Lidoderm patches in the past which were efficacious but she has run out of these. She comes in today ostensibly because she believes that she is unable to continue to work and that even on limited hours and days her pain is such that she cannot continue in her present work environment.
>
> * * *
>
> IMPRESSION:
> The patient is status post complex reconstruction of the thoracolumbar junction status post traumatic injury to the T12 vertebral body with persistent intractable pain. A substantial component of this is likely post thoracotomy pain.
>
> RECOMMENDATIONS:
> As I had opined in a previous note, I believe that a "compelling" case could be made for the patient for total permanent disability and my opinion at the time of this dictation is unchanged. The patient does not wish to continue in the work environment at this time because of intractable pain and I have encouraged her therefore to seek permanent and total disability.
>
> Going forward, I would recommend medication management of intractable pain with attempt to avoid chronic utilization of opioid analgesics in order to avoid the

complications of tolerance and dependence upon opioid analgesia. I would recommend continued utilization of Cymbalta to address the neuropathic component of her left "post thoracotomy syndrome" pain.

{¶ 25} 6. On August 8, 2014, Dr. Cecil completed a C-140 form captioned "Application for Wage Loss Compensation." On the form, Dr. Cecil indicated that claimant was capable of working five days per week for two hours a day.

{¶ 26} 7. On August 11, 2014, Dr. Cecil authored a letter sent to claimant's counsel. Dr. Cecil wrote:

> As I have previously opined, I believe to a reasonable degree of medical certainty based upon my training as a fellowship-trained spinal surgeon and upon my intimate involvement with this case that Candie L. Simon is permanently and totally disabled from sustained remunerative activity. The patient has had extensive and appropriate nonoperative as well as operative intervention to address a T12 "burst" fracture. She has at this time reached maximum medical improvement and no additional intervention is likely to alter this patient's clinical outcome. Nevertheless, the patient continues to have intractable thoracolumbar pain which unfortunately hampers her ability to be employed because of its difficulty to control satisfactorily. Multiple attempts to reengage the patient in the work force have been, unfortunately, unsuccessful and it is unlikely that additional attempts will change that outcome.

{¶ 27} 8. On September 2, 2014, claimant filed an application for PTD compensation. In support, claimant submitted the August 11, 2014 report (or letter) from Dr. Cecil.

{¶ 28} 9. On November 21, 2014, claimant signed a written agreement to participate in vocational rehabilitation and a job search through VocWorks. The agreement and claimant's participation generated the following report:

> During [Job Seeking Skills Training ("JSST")], this [Vocational Specialist ("VS")] has met the claimant several times and we went over practice interviews several times, developed a current resume, showed her where to find jobs, went over a practice application, cover letter, discussed importance of thank you letters, and discussed appropriate dress. She remains very motivated to proceed, is interested in [Living Maintenance] benefits and signed all paperwork.

Ms. Simon was referred for three weeks of [JSST] starting the week of November 20, 2014. Participation was required two times a week.

The VS met with Ms. Simon again on 11/21/14 and 11/20/14. The VS provided Ms. Simon with a JSST manual and completed a questionnaire/intake. The VS also provided and went over various Intake forms, Advocacy phone numbers, and provided a VocWorks handbook.

Ms. Simon said she is looking for part-time work. She said she believes she is not released to work, however will work if advised by her Attorney. She said he is open to job goals, such as receptionist, accounts payable, customer service, sales and data entry positions. She said she is concerned with her lack of stamina and strength. She said she does have a valid driver's license and reliable transportation. She does not have a criminal record.

The VS met with Ms. Simon on 11/20/14 and 11/21/14. Ms. Simon completed the generic application and references were gone over. Transferable skills were also gone over. Ms. Simon and this VS developed a current resume. She was a active participant in the development. Job goals and employment history were gone over. Also reasons for leaving jobs, etc.

The VS met with Ms. Simon again on 11/24/14 and 11/25/14. The VS and Ms. Simon went over where to look for jobs and on-line job searches. Researching companies and dress/grooming were also gone over. The VS and Ms. Simon went over cover letters, thank you letters, and started going over interviewing. Interviewing skills and steps in the interview process were gone over.

On 12/12/14, this VS informed the claimant that a letter offer of employment was sent to her from the [Employer of Record]. She said she received it and was awaiting instruction from her Attorney. She said she never has seen her restrictions.

{¶ 29} 10. By letter dated November 21, 2014, Dalton plant manager Don Diglaw offered claimant a part-time position as a "Front Desk Administrator" at Dalton. The two-page letter concluded:

The Front Desk Administrator position will pay $15.31 per hour. Consistent with your physician's restrictions, your scheduled work hours will require you to work Monday through Friday from 11 AM to 1 PM. It is our hope that your first day of work can be on 12-8-14. As such, please call me upon receipt of this letter so that we can coordinate your return to work.

{¶ 30} 11. On March 17, 2015, claimant began the "Front Desk Administrator" job at Dalton. She worked two hours per day, five days per week until April 1, 2015.

{¶ 31} 12. On April 6, 2015, claimant was again examined by Dr. Cecil. In his office note of that date, Dr. Cecil wrote:

The patient has been considered disabled for sustained remunerative activity by me. In fact, it is my impression that she is receiving disability benefits from Social Security. Nevertheless, it is my understanding that the patient has been returned by her employer to a sedentary job. Her biggest complaint with prolonged sitting is left hernithoracic pain. Worse than the prolonged sitting at work is the sitting in the car to drive to work. At times, this left hernithoracic pain has become intolerable for her. Both Cymbalta and tramadol are utilized which are efficacious though incompletely so.

\* \* \*

IMPRESSION:
The patient is doing acceptably well at the present time. Unfortunately, persistent left hernithoracic pain and midline pain at the thoracolumbar junction impede her ability to sit for a sustained period of time, either at work or in a motor vehicle traveling to work.

RECOMMENDATIONS:
As I have previously opined, given the fact that the patient has reached maximum medical improvement, and despite this improvement has intractable pain even with sedentary activities, I am left to conclude to a reasonable degree of medical certainty that the patient is disabled for sustained remunerative activity and would be better served (unfortunately) by not working.

{¶ 32} 13. Earlier, on November 12, 2014, at relator's request, claimant was examined by Dennis A. Glazer, M.D.    In his four-page narrative report, dated November 24, 2014, Dr. Glazer opined:

> Ms. Simon has reached maximum medical improvement. At this point, she would only require maintenance treatment and continuation of her medication.
>
> * * *
>
> Ms. Simon is unable to return to her former position of employment as a receiving clerk. She could not do lifting beyond 10 lbs. She would have to do limited walking and carrying. She also could not drive a tow-motor.
>
> * * *
>
> Ms. Simon would have a 10 lb. weight limit for carrying. She could only walk intermittently for a total of one hour out of the day. She could do no stooping, lifting, or climbing.
>
> * * *
>
> Ms. Simon is not permanently and totally impaired from all sustained remunerative employment. She is employable at a sedentary level.
>
> * * *
>
> Ms. Simon's condition is permanent. She is unlikely to have any significant degree of improvement over her condition as it is present at this time. She has reached maximum medical improvement.

{¶ 33} 14. On February 5, 2015, at the commission's request, claimant was examined by Nicholas Varrati, M.D.  In his six-page narrative report, Dr. Varrati states:

> History of Present Illness
>
> * * *
>
> She states she was then referred to Dr. Cecil. She states she underwent a myelogram and other diagnostics. She states she had returned to work intermittently during this time. She states she underwent surgery on 5/16/2012 which consisted of anterior corpectomy at T12. She states she did not note

significant improvement after the surgery. She states she returned to work in 2013, to a receptionist job. She states she last worked in February of 2014. She states her current treatment consists of home exercise and medication. She states no further treatment has been recommended.

Current Symptoms: Her pain level is rated as 6/10 with exacerbation to 10/10. Her pain is constant and is located in the low back and left side. The pain is described as burning, throbbing, stabbing, aching, shooting, sore and dull. Her pain is improved with heat and medications. Her pain is worsened with any type of activity. She notes occasional pain to the left leg down to the calf.

Function: She is able to stand for 5 minutes, sit for 10-15 minutes and drive for 45-60 minutes. She is able to walk for 1/2 block and uses a cane on rough ground. She is able to lift approximately 8 pounds. She is able to bend over at the waist. She is unable to squat. She is able to navigate stairs with difficulty. She is able to perform self-care. She is no longer able to participate in fishing, boating, hiking, gardening or swimming.

* * *

Review of Medical Records: I have reviewed all of the records provided to me by the Industrial Commission.

Physical Examination:
Examination of the thoracic spine revealed a well healed 16cm thoracotomy scar on the left. There was hypersensitivity approximately 3-4cm surrounding the scar. There was also a 3cm chest tube scare [sic] on the left. There was tenderness to palpation over the T4-T12 paravertebral musculature diffusely.

* * *

In consideration of the allowed conditions, the records reviewed, the Injured Worker's subjective complaints and reports of self-function, and today's findings of localized tenderness over the T4-12 and L1-5 paravertebral musculature, and decreased range of motion, it is my opinion that she would be unable to sustain remunerative employment.

{¶ 34} Also, in his report, Dr. Varrati opined that the allowed conditions of the claim produced a combined whole person impairment of 43 percent.

{¶ 35} 15. Following the February 5, 2015 examination, Dr. Varrati also completed a "Physical Strength Rating" form. By his mark, Dr. Varrati indicated: "This Injured Worker is incapable of work."

{¶ 36} 16. The record contains a report of surveillance from InfoQuest, a private investigative firm. The report indicates that surveillance was conducted on claimant on April 29, May 9, and May 25, 2013. The report summarizes as follows:

> On 4-29-13, the subject left the heading address driving her registered white Dodge truck, auto tag No. FJK-9220. She was followed to the Carrollton Veterinary, where she entered without any animals, and exited several minutes later with a small package, to Thorne's grocery store, where she entered for several minutes, and to Rite Aid, where she made a small purchase. She was then followed to her residence, where no further activity was observed. (See video).

> On 5-9-13, the subject left her residence driving her registered white Dodge truck, auto tag No. FJK-9220. She was followed to the Post Office in Carrollton, where she entered for several minutes, and then to the heading address, where no further activity was observed. (See video).

> On 5-25-13, the subject was not observed outside the heading address. Her registered white Dodge truck, auto tag No. FJK-9920 [sic], was present in the morning. Surveillance was conducted from a position to observe the marina due to the subject putting her boat in the water last week, which did not allow this investigator to maintain a visual on the subject's registered truck if it departed. A canvas of the heading address in the early afternoon found the subject's registered Dodge truck gone from the residence. A canvas of the downtown area of Carrollton and the surrounding area in the vicinity of the subject's cottage did not locate the subject's Dodge truck.

> See attached: 9 minutes and 5 seconds of video.

{¶ 37} The InfoQuest report further indicates that surveillance was conducted on August 2, August 6, August 28, and September 5, 2013. The report summarizes as follows:

On 8-2-13, the subject was not observed outside the heading address. An unidentified male left the heading address for a half hour in the subject's registered white Dodge truck, auto tag No. FJK9220. No additional activity was observed.

On 8-6-13, the subject left the heading address driving her registered Dodge truck, tag No. FJK9220. She was followed to Drug Mart, where she made a purchase, which she carried out of the store in her right hand, and to Thorne's Market, where she exited pushing a shopping cart containing several purchases. She loaded her purchases into the passenger side of her Dodge truck, returned the cart to the cart return, and drove away. She was followed to the heading address, where no further activity was observed. (See video).

On 8-28-13, the subject was observed standing at the front door of the heading address as this investigator initiated surveillance. Later in the morning, the subject left the heading address driving her registered white Dodge, truck auto tag No. FJK9220. She was followed into town, where surveillance had to be discontinued to avoid detection.

On 9-5-13, the subject left the heading address as a passenger in her registered white Dodge truck, auto tag No. FJK9220, accompanied by an unidentified male driver. She was followed to her IME at US Health Works, 2626 Fulton Road, Canton, Ohio, where she was dropped off and walked to the main entrance. The unidentified male returned to US Health Works an hour and forty-eight minutes later to pick her up. She was followed to a Dairy Queen in Malvern, Ohio, where the male driver used the drive-through service, and to Drug Mart in Carrollton, Ohio, where the male driver used the pharmacy drive-through window. The subject was then followed to Autumn Road, which leads to Doral Road and the heading address. To avoid detection, the subject's vehicle was not followed. No further activity was observed. (See video).

See attached: 9 minutes and 17 seconds of video.

{¶ 38} The InfoQuest report further indicates that surveillance was conducted on July 4, August 18, September 16, November 20, and on November 21, 2014. The report summarizes as follows:

On 7-4-14, the subject was briefly observed standing on the front porch of the heading address with a dog. She was not

wearing any support devices and appeared well and able. While attempting to obtain video footage of subject, she appeared to take notice of this investigator's vehicle. To avoid arousing her suspicion and compromise the ongoing investigation, this investigator elected [to] not take video at this time and continue surveillance at the entrance/exit of the cabin community in hopes of observing the subject leaving in her registered white Dodge truck, auto tag No. FJK-9220, which was present. There was a great deal of activity in the area with many people outside celebrating the holiday. An unidentified male did come and go from the residence driving the subject's registered Dodge truck. A source met with this investigator at his residence, which is several cabins down from the subject's, but his location provided no direct visual of her residence. Based on additional information gleaned from the source, this investigator headed to Camp Muskingum in an effort to attempt to locate the subject, who may have been on a pontoon boat. Upon arrival at the camp, numerous pontoon boats were on the lake. This investigator confirmed the subject was not on any of the boats and then returned to the entrance/exit of the cabin community. No additional subject activity was observed.

On 8-18-14, the subject arrived a half hour early for her 9:30 a.m. IME appointment at 4450 Balden Street, Canton, OH, as a passenger in her registered white Dodge truck, auto tag No. FJK9220, accompanied by an unidentified male driver. The subject exited her vehicle in a normal manner and entered and exited the building without obvious difficulty. She then returned to her truck, which she entered in one continuous motion and was followed to Harbor Freight in Canton, OH, where she and the male driver entered for several minutes, and to Tractor Supply in Carrollton, OH, where she and the male entered for several minutes. The male driver exited Tractor Supply with a small purchase and the subject entered the passenger seat of her truck in one continuous motion. She was followed to Doral Road SW, the location of the heading address, where no further activity was observed. (See video).

On 9-16-14, the subject was scheduled for a 9:00 a.m. hearing at the Senator Ocasek Building, 161 South Main Street, Akron, OH. There was no sign of the subject inside or outside of the building. The subject's name was called for her hearing at 9:15 a.m., but she was not observed. Two attorneys entered the room.

On 11-20-14, the subject arrived at the Carrollton Library for her 12:00 p.m. appointment driving her registered white Dodge truck, auto tag No. FJK 9220. She entered and exited the library and climbed in and out of her truck without obvious difficulty. She was then followed to Drug Mart, Tractor Supply and Thornes Market. She made purchases at each location that she pushed out of each store in a shopping cart. She loaded those items into her truck, which also included a large bag of dog or cat food. She was then followed to her residence. (See video).

On 11-21-14, the subject left the heading address driving her registered Dodge truck, auto tag No FJK 9220. She was followed to the Carrollton Library for her scheduled 11:00 a.m. meeting. Following her hour meeting, she returned to her registered vehicle and returned home. No additional subject activity was observed. (See video).

See Video tab for 25 minutes and 42 seconds of video.

{¶ 39} The InfoQuest report further indicates that surveillance was conducted on April 11 and May 2, 2015. The report summarizes as follows:

On 4-11-15, the subject was observed walking about the area around Leesville Lake for the dock installation. She was holding a clip board and appeared as if she may have been the organizer of the event. During the surveillance period, she was observed moving a bench around to face the lake, she bent over at the waist to pick up a child's plastic swing, which she handed to another person, helped a child off a picnic table, and sat for periods of time on the bench. She also appeared to ready a picnic table for lunch, continued walking about the area, and sat among the residents at the picnic tables. The activities in which the subject engaged such as bending over at the waist, walking about the area, picking up and moving items were done with no obvious signs of difficulty. (See video).

On 5-2-15, the subject was observed walking her dog at the end of the road, near the edge of Leesville Lake. She sat down near the edge of the lake with the dog's lead/leash looped over her right arm. After several minutes, she stood up in one continuous motion and bent over at the waist to untangle the leash. While the subject held the leash in her left hand, the large dog walked over to the boardwalk, where the subject appeared to pull back on the leash to not allow the dog to continue on the boardwalk. The subject then

walked her dog up the road, toward the heading address. In the late afternoon, the subject was briefly observed walking around the neighborhood with an unidentified male, a small child and her dog. (See video).

See Video tab for 1 hour, 36 minutes and 50 seconds of video.

{¶ 40} 17. On June 17, 2015, the PTD application was heard by an SHO. The hearing was recorded and transcribed for the record. The transcript is 104 pages in length.

{¶ 41} 18. Following the June 17, 2015 hearing, the SHO issued an order awarding PTD compensation beginning April 6, 2015, which is the date of one of Dr. Cecil's office notes. Relying on the reports of Dr. Varrati and Cecil, the SHO found that the medical impairment from the allowed conditions alone preclude all sustained remunerative employment. Thus, it was not necessary for the SHO to consider the non-medical disability factors. The SHO also addressed the surveillance evidence, relator's job offer, and claimant's employment during the pendency of the PTD application.

{¶ 42} The SHO's order of June 17, 2015 explains:

> The Injured Worker sustained a back injury on 04/12/2011 while working as a receiving laborer for the named Employer. The Injured Worker was using a forklift to unload a pipe truck. The Injured Worker's load shifted, causing the Injured Worker's forklift to slam down. The Injured Worker was taken to the hospital and admitted for approximately five days. Surgery was authorized to treat the ruptured disc at T12-L1. The Injured Worker underwent a surgical procedure consisting of an anterior corpectomy T12 vertebral body through left thoracotomy with partial resection of left tenth rib. Additionally, the Injured Worker underwent an allograft fusion with rib allograft T11 to L1 with placement of cage strut and anterolateral plates and screws with placement of a French chest tube. Subsequently, the claim was allowed for post thoracotomy syndrome.
>
> The Injured Worker was examined by Nicholas Varrati, M.D., on 02/05/2015. Dr. Varrati found the Injured Worker's pain is constant and worsened with any type of activity. Upon examination, he found tenderness to palpation over the T4-T12 paravertebral musculature. Dr. Varrati noted decreased range of motion and opined the

Injured Worker has reached maximum medical improvement. He assigned a 43 percent whole person impairment and completed physical strength rating report. Based on his findings of tenderness and decreased range of motion, Dr. Varrati concluded the Injured Worker is unable to engage in sustained remunerative employment.

The Injured Worker was examined by Mark Cecil, M.D., on 04/06/2015. Dr. Cecil submitted a report dated 08/11/2014 and treatment record dated 04/06/2015. Dr. Cecil notes the Injured Worker had extensive operative and nonoperative medical intervention to address the T12 fracture. He found the Injured Worker continues to experience intractable thoracolumbar pain which is difficult to control. Dr. Cecil concludes the Injured Worker is permanently and totally disabled.

The opinions of Dr. Varrati and Dr. Cecil are supported by their physical examination findings. Accordingly the Staff Hearing Officer concludes the Injured Worker is unable to engage in sustained remunerative employment.

Based upon the reports of Dr. Varrati and Dr. Cecil, it is found that the Injured Worker is unable to perform any sustained remunerative employment solely as a result of the medical impairment caused by the allowed conditions. Therefore, pursuant to State ex rel. Speelman v. Indus. Comm. (1992), 73 Ohio App.3d 757, it is not necessary to discuss or analyze the Injured Worker's non-medical disability factors.

Counsel for the Employer submitted surveillance video evidence. Counsel for the Employer contends that Permanent and Total Disability benefits are not appropriate given the surveillance video evidence. Counsel's contention is not found persuasive. The Injured Worker was surveilled on various dates from 4/29/2013 through 05/02/2015. The surveillance was conducted for multiple hours over a period of approximately two years. Per the Employer's Counsel, the evidence consists of two to three hours of the Injured Worker's activities. The Injured Worker was video taped performing a host of activities, including but not limited to: driving, running errands, grocery shopping, going to the pharmacy, going to the post office, walking her dog, and going to the veterinarian's office. The Staff Hearing Officer finds the activities on the video tape are not so inconsistent

as to impeach the medical evidence and restrictions outlined by Dr. Varrati and Dr. Cecil.

The Injured Worker was video taped over an extensive period of time. Many of the entries in the surveillance summary reference no activity by the Injured Worker. The simple activities of daily living, running errands, driving, grocery shopping, and tending to a pet are not found to be inconsistent with the opinions of Dr. Varrati and Dr. Cecil. Dr. Varrati found the Injured Worker's pain is constant and worsens with any type of activity. Likewise, Dr. Cecil described the Injured Worker's pain as intractable thoracolumbar pain that is difficult to satisfactorily control. Thus, the activities on the video tape are not found sufficient to defeat the Application for Permanent and Total Disability benefits.

Counsel for the Employer also contends that Permanent and Total Disability compensation is not substantiated as the named Employer has a job available for the Injured Worker. Counsel's contention is not found persuasive. Counsel for the Employer references a position as a front desk administrator for the named Employer. This position entails greeting guests and notifying the appropriate party upon arrival, answering the telephone, and transferring calls to the appropriate individual.

By way of history, the Injured Worker testified she previously performed this light duty job on two occasions and was unable to perform the job due to pain stemming from the allowed conditions. The Injured Worker testified she last worked this job from approximately 03/17/2015 to 04/01/2015. The Injured Worker testified that she worked two hours per day, five days per week. The Injured Worker's testimony is supported by the 08/11/2014 report and 04/06/2015 treatment record of Dr. Cecil. Dr. Cecil opines the Injured Worker is unable to satisfactorily control her pain. He references the multiple unsuccessful attempts to re-engage the Injured Worker in the workforce. He concludes it is unlikely that any additional attempts will change that outcome. The opinion of Dr. Cecil is found persuasive. Accordingly, the Staff Hearing Officer concludes the Injured Worker is unable to engage in sustained remunerative employment, including the front desk administrator position available at the named Employer.

Accordingly, the Staff Hearing Officer concludes the Injured Worker has established she is entitled to Permanent and Total Disability compensation. Said compensation is awarded to commence effective 04/06/2015, based upon the 04/06/2015 treatment record completed by Dr. Cecil. Dr. Cecil opines the Injured Worker is Permanently and Totally Disabled in this treatment record.

**{¶ 43}** 19. On July 6, 2015, relator moved for reconsideration of the SHO's order of June 17, 2015.

**{¶ 44}** 20. On July 14, 2015, claimant filed a memorandum in opposition to relator's request for reconsideration.

**{¶ 45}** 21. On July 16, 2015, the three-member commission mailed an order denying relator's request for reconsideration.

**{¶ 46}** 22. On June 3, 2016, relator, Wayne Dalton Corporation, filed this mandamus action.

Conclusions of Law:

**{¶ 47}** Two issues are presented: (1) whether the August 11, 2014 and the April 6, 2015 reports of Dr. Cecil provide some evidence on which the commission relied to support the finding that the allowed conditions alone preclude all sustained remunerative employment, and (2) whether the report of Dr. Varrati provides some evidence on which the commission relied to support the finding that the allowed conditions alone preclude all sustained remunerative employment.

**{¶ 48}** The magistrate finds: (1) the August 11, 2014 and the April 6, 2015 reports of Dr. Cecil provide some evidence on which the commission relied to support the finding that the allowed conditions alone preclude all sustained remunerative employment, and (2) the report of Dr. Varrati provides some evidence on which the commission relied to support the finding that the allowed conditions alone preclude all sustained remunerative employment.

**{¶ 49}** Accordingly, it is the magistrate's decision that this court deny relator's request for a writ of mandamus, as more fully explained below.

## First Issue

**{¶ 50}** Equivocal medical opinions are not evidence. *State ex rel. Eberhardt v. Flxible Corp.*, 70 Ohio St.3d 649, 657 (1994). Equivocation occurs when a doctor

repudiates an earlier opinion, renders contradictory or uncertain opinions, or fails to clarify an ambiguous statement. *Id.*

{¶ 51} A medical report can be so internally inconsistent that it cannot be some evidence on which the commission can rely. *State ex rel. Lopez v. Indus. Comm.*, 69 Ohio St.3d 445 (1994); *State ex rel. Taylor v. Indus. Comm.*, 71 Ohio St.3d 582 (1995). However, a court will not second-guess a doctor's medical expertise to support a claim of internal inconsistency. *State ex rel. Young v. Indus. Comm.*, 79 Ohio St.3d 484 (1997).

{¶ 52} In *State ex rel. Certified Oil Corp. v. Mabe,* 10th Dist. No. 06AP-835, 2007-Ohio-3877, this court states:

> "In general, the court does not 'second guess' medical opinions from medical experts and will remove a medical opinion from evidentiary consideration as having no value only when the report is patently illogical or contradictory * * *." *State ex rel. Tharp v. Consol. Metal Prods.*, Franklin App. No. 03AP-124, 2003 Ohio 6355, P67. Moreover, it is well established that issues of weight and credibility of evidence lie outside the scope of mandamus inquiry. *State ex rel. Burley v. Coil Packing, Inc.* (1987), 31 Ohio St.3d 18, 31 OBR 70, 508 N.E.2d 936. The commission, as the finder of fact, has exclusive authority to determine the persuasiveness of evidence. *State ex rel. Teece v. Indus. Comm.* (1981), 68 Ohio St.2d 165, 429 N.E.2d 433; *State ex rel. Bell v. Indus. Comm.* (1995), 72 Ohio St.3d 575, 1995 Ohio 121, 651 N.E.2d 989.

*Id.* at ¶ 4.

{¶ 53} In *State ex rel. Toth v. Indus. Comm.*, 80 Ohio St.3d 360, 362 (1997), the Supreme Court of Ohio held that "part-time work constitutes sustained remunerative employment." *Id.* at 362. However, the *Toth* court did not hold that any part-time work—no matter how few the hours per week the job might entail—is considered sustained remunerative employment.

{¶ 54} On a case-by-case basis, guidance from this court has developed over time as to what part-time employment may be viewed as sustained remunerative employment.

{¶ 55} Recently, in *State ex rel. Sheller-Chiles v. Indus. Comm.,* 10th Dist. No. 13AP-245, 2014-Ohio-313, ¶ 5, this court had occasion to review the case law establishing the standard for determining what part-time work capacity constitutes

sustained remunerative employment. This court held that a work capacity of "four or more hours per day" constitutes sustained remunerative employment. *Id.* See *State ex rel. Bonnlander v. Hamon,* 10th Dist. No. 14AP-855, 2015-Ohio-4038. (Providing a succinct discussion of *Toth* and *Sheller-Chiles.*)

{¶ 56} According to relator, Dr. Cecil's statement on the C-140 form completed August 8, 2014 that claimant was capable of working five days per week for two hours a day contradicts his later opinion in his August 11, 2014 report that claimant "is permanently and totally disabled from sustained remunerative activity."

{¶ 57} As relator puts it here, just three days after completing the C-140, "with no interim examination, office visit or contact with" claimant, Dr. Cecil "completely changed his opinion and indicated that [claimant] has no work capability whatsoever." (Relator's brief at 4.) (Relator's reply to claimant's brief at 6.)

{¶ 58} Relator's argument is seriously flawed. Dr. Cecil did not state in his August 11, 2014 report that claimant "has no work capability whatsoever" as relator incorrectly asserts. Relator, in effect, endeavors to rewrite Dr. Cecil's August 11, 2014 report in order to render an alleged contradictory statement.

{¶ 59} As this court made clear in the *Sheller-Chiles* case, a work capacity of four or more hours per day can constitute sustained remunerative employment. However, a work capacity of less than four hours per day cannot be a capacity for sustained remunerative employment. *Bonnlander* at ¶ 4.

{¶ 60} Given the above authorities, it is clear that Dr. Cecil's statement on the August 8, 2014 C-140 that claimant can work two hours per day and five days per week, is not a statement that claimant is capable of sustained remunerative employment. Clearly, the August 8, 2014 C-140 is consistent with Dr. Cecil's opinion in his August 11, 2014 report that claimant "is permanently and totally disabled from sustained remunerative activity."

{¶ 61} As earlier noted, the SHO's order of June 17, 2015 also relies on the April 6, 2015 Office note of Dr. Cecil. In fact, the PTD award was started on April 6, 2015 based on Dr. Cecil's April 6, 2015 report. Again, the April 6, 2015 office note states:

> The patient has been considered disabled for sustained remunerative activity by me. In fact, it is my impression that she is receiving disability benefits from Social Security.

Nevertheless, it is my understanding that the patient has been returned by her employer to a sedentary job. Her biggest complaint with prolonged sitting is left hernithoracic pain. Worse than the prolonged sitting at work is the sitting in the car to drive to work. At times, this left hernithoracic pain has become intolerable for her. Both Cymbalta and tramadol are utilized which are efficacious though incompletely so.

* * *

IMPRESSION:
The patient is doing acceptably well at the present time. Unfortunately, persistent left hernithoracic pain and midline pain at the thoracolumbar junction impede her ability to sit for a sustained period of time, either at work or in a motor vehicle traveling to work.

RECOMMENDATIONS:
As I have previously opined, given the fact that the patient has reached maximum medical improvement, and despite this improvement has intractable pain even with sedentary activities, I am left to conclude to a reasonable degree of medical certainty that the patient is disabled for sustained remunerative activity and would be better served (unfortunately) by not working.

{¶ 62} According to relator, Dr. Cecil's opinion that claimant "is disabled for sustained remunerative activity" cannot constitute evidence of permanent total disability because, as relator asserts, "there are no restrictions on driving per the medical claim file" and claimant's testimony. (Relator's brief at 14.)

{¶ 63} Before the SHO, claimant testified:

Q. Do you know if you have any restrictions from Dr. Cecil or any other doctor on driving?

A. No, I do not.

Q. Okay. So you can drive anywhere you want, right?

A. If I can stand to.

(June 17, 2015 Tr. at 41.)

**{¶ 64}** It is difficult to see how the absence of a written driving restriction flaws Dr. Cecil's opinion that claimant is "disabled for sustained remunerative activity."

**{¶ 65}** Clearly, a driving restriction is not a prerequisite for showing an inability to perform sustained remunerative employment. Moreover, one who has been adjudicated permanently and totally disabled is not precluded from driving a motor vehicle. See *State ex rel. Lawson v. Mondie Forge*, 104 Ohio St.3d 39, 2004-Ohio-6086. (The claimant drove a dump truck while receiving PTD compensation.) *Id.* at ¶ 5. (Where children are involved, significant chauffer time may be required while on PTD.) *Id.* at ¶ 20.

**{¶ 66}** Based on the above analysis, the magistrate concludes that the August 11, 2014 and April 6, 2015 reports of Dr. Cecil are indeed some evidence on which the commission can rely to support its determination that claimant is unable to perform sustained remunerative employment.

### Second Issue: Dr. Varrati's Report

**{¶ 67}** According to relator, Dr. Varrati's report is not some evidence on which the commission can rely because the report is "incomplete," a term used by relator to describe the report. (Relator's brief at 18.)

**{¶ 68}** In reading Dr. Varrati's six-page narrative report, some observations can be made. As relator points out, the report does not indicate that claimant informed Dr. Varrati at the examination of certain events in the claim that relator feels should have been disclosed or mentioned by Dr. Varrati in his report. For example, relator asserts that Dr. Varrati was not informed that relator had extended a job offer and that claimant was involved in vocational rehabilitation and a job search.

**{¶ 69}** Presumably, from information provided by claimant at the examination, Dr. Varrati reports limitations on standing, sitting, walking, and driving. Relator declares that the reported limitations are "patently false" when compared to the surveillance evidence of record and the hearing testimony of Mr. Diglaw. (Relator's brief at 19.)

**{¶ 70}** Based on the foregoing, relator concludes that Dr. Varrati's report is "incomplete" and, therefore, cannot provide some evidence on which the commission can rely.

**{¶ 71}** Relator's challenge to Dr. Varrati's report misperceives the role of the examining doctor and ignores an administrative remedy that relator had, but failed to

pursue. That is, relator failed to seek leave from the commission to take Dr. Varrati's deposition.

{¶ 72} Ohio Adm.Code 4121-3-09(A)(8) currently provides:

Procedure for obtaining the oral deposition of, or submitting interrogatories to, an industrial commission or bureau physician.

(a) A request to take the oral deposition of or submit interrogatories to an industrial commission or bureau physician who has examined an injured or disabled worker or reviewed the claim file and issued an opinion shall be submitted in writing to the hearing administrator within ten days from the receipt of the examining or reviewing physician's report and the applicant shall simultaneously mail a copy of the request to all parties, or if represented, to the representatives of the parties.

(b) The request must set out the reasons for the request and affirm that the applicant will pay all costs of the deposition or interrogatories including the payment of a reasonable fee, as defined below, to the physician and will furnish a copy of the deposition or the interrogatory to the opposing party and to the file.

(c) If the hearing administrator finds that the request is a reasonable one, the hearing administrator shall issue a compliance letter that will set forth the responsibilities of the party that makes the request.

{¶ 73} At oral argument before the magistrate on March 29, 2017, the magistrate was informed by all counsel attending the hearing that relator did not file a request to take the oral deposition of or submit interrogatories to Dr. Varrati regarding his examination of claimant on February 5, 2015.

{¶ 74} Clearly, pursuant to Ohio Adm.Code 4121-3-09(A)(8), relator could have requested leave to depose Dr. Varrati regarding the surveillance evidence of record and other evidence of record that relator feels should have been disclosed to Dr. Varrati at the time of his examination of claimant and the issuance of his narrative report. See *State ex rel. Midmark Corp. v. Indus. Comm.*, 78 Ohio St.3d 2 (1997); *Lawson* at ¶ 30.

{¶ 75} Based on the foregoing, the magistrate concludes that relator has failed to show that the report of Dr. Varrati cannot be relied on to support the PTD award.

{¶ 76} Accordingly, it is the magistrate's decision that this court deny relator's request for a writ of mandamus.

/S/ MAGISTRATE
KENNETH W. MACKE

**NOTICE TO THE PARTIES**

Civ.R. 53(D)(3)(a)(iii) provides that a party shall not assign as error on appeal the court's adoption of any factual finding or legal conclusion, whether or not specifically designated as a finding of fact or conclusion of law under Civ.R. 53(D)(3)(a)(ii), unless the party timely and specifically objects to that factual finding or legal conclusion as required by Civ.R. 53(D)(3)(b).